# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NASEEM M. CHAUDHRY, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 12 C 5838 |
| PROVIDENT LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY and | ) | |
| UNUM GROUP, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Naseem M. Chaudhry, M.D., suffers from a deteriorative eye condition, which has impaired his ability to drive and treat his psychiatric patients. Defendant Provident Life and Accident Insurance Company ("Provident Life") paid total disability benefits to Plaintiff under a disability insurance policy from mid-2003 to August 2011. After Provident Life terminated Plaintiff's disability benefits on August 15, 2011, Plaintiff sued Provident Life and its parent company, Unum Group, for breach of contract, unreasonable and vexatious conduct, and declaratory relief arising from the termination of his disability benefits. (*See* R. 78, Second Am. Compl. ¶¶ 44-86.)

Before the Court are the parties' cross-motions for summary judgment and Defendants' motion to strike certain materials from Plaintiff's summary judgment submission. For the following reasons, the Court grants in part and denies in part as moot Defendants' motion to strike (R. 115), grants in part and denies in part Defendants' motion for summary judgment (R. 98), and denies Plaintiff's motion for summary judgment (R. 101).

**BACKGROUND**

**I.      Northern District of Illinois Local Rule 56.1**

"For litigants in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012). Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). It assists the court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Br. of Trs.,* 233 F.3d 524, 527 (7th Cir. 2000).

Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.,* 559 F.3d 625, 632 (7th Cir. 2009) (citing L.R. 56.1(a)(3)). Under Local Rule 56.1(b)(3), the opposing party then must submit a "concise response" to each statement of fact, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *See id.* (citing L.R. 56.1(b)(3)(B)). District courts disregard Local Rule 56.1 statements and responses that do not cite specific portions of the record or that contain irrelevant information, legal arguments, conjecture, or evasive denials. *See, e.g., id.* at 632; *Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006); *Bordelon,* 233 F.3d at 528. "When a responding party's statement fails to dispute the facts set forth in the moving party's statement

2

in the manner dictated by [Local Rule 56.1], those facts are deemed admitted for purposes of the [summary judgment] motion." *Cracco,* 559 F.3d at 632.

If the party opposing summary judgment wants the court to consider additional facts in deciding the motions, it also must submit a statement of additional facts with supporting citations to the record pursuant to Local Rule 56.1(b)(3)(C). *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643 (7th Cir. 2008). "[D]istrict court[s] [are] entitled to expect strict compliance with Local Rule 56.1." *Cichon v. Exelon Gen. Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005) (citation omitted). A court, in its discretion, may choose to disregard statements of fact and responses, in full or in part, that do not comply with Local Rule 56.1's requirements. *See, e.g., Cracco,* 559 F.3d at 632; *Cichon,* 401 F.3d at 809-10; *Cady,* 467 F.3d at 1060; *Bordelon,* 233 F.3d at 528.

In this case, both Plaintiff and Defendants failed to comply with their obligations under Local Rule 56.1. Although Local Rule 56.1(a) requires the parties' statements of facts and statements of additional facts to consist of "*short* numbered paragraphs," *see* L.R. 56.1(a)(1), (b)(3)(C) (emphasis added), the parties submitted statements of fact or additional fact that are several sentences and, in some cases, more than a page long. Additionally, the parties included in their Local Rule 56.1 statements facts that are clearly in dispute. Finally, the parties' statements of fact and their responses contain a significant amount of legal argument. The Court has disregarded any legal arguments presented in the parties' statement of facts and responses in determining which, in any, facts are undisputed in this action. The parties' blatant non-compliance with both the letter and spirit of Local Rule 56.1 has substantially increased the Court's burden in resolving the pending motions.

## II.    Relevant Facts

### A.    Jurisdiction and Venue

The following facts are undisputed unless otherwise noted.[1]  Plaintiff, a citizen of Illinois, was a board-certified psychiatrist at all times relevant to this case.  (Pl. L.R. 56.1 Stmt. ¶ 1.) Defendant Provident Life, a Tennessee corporation, sells and provides insurance services (*id.* ¶ 2), and Defendant Unum Group, a Delaware corporation, is Provident Life's parent company.[2] (Def. L.R. 56.1 Stmt. ¶ 5.)  Both Defendants have their principal place of business in Chattanooga, Tennessee.  (Pl. L.R. 56.1 Stmt. ¶¶ 2-3.)  The Court has diversity jurisdiction over this matter because complete diversity exists and the amount in controversy exceeds $75,000. (*See id.* ¶¶ 1-5.)  Defendants do not challenge that the Court has personal jurisdiction over them, and the parties agree that venue is proper in this District pursuant to 28 U.S.C. § 1391.  (*See id.* ¶ 6.)

### B.    Plaintiff's Disability Income Policy

Provident Life issued Disability Income Policy No. 06-337-4060396 (the "Policy") to Plaintiff effective August 7, 1991.  (*Id.* ¶ 8.)  The Policy provides two types of benefits: Total Disability benefits and Residual Disability benefits.  (*See* Second Am. Compl. Ex. A, Policy at 4-6, 9-10.)  Total Disability benefits apply when, due to injury or sickness, the insured (1) is not able to perform the "substantial and material duties of [his] occupation" and (2) "[is] receiving care by a Physician which is appropriate for the condition causing the disability."  (*Id.* at 4.)

---

[1] Citations to the parties' Local Rule 56.1 statements refer collectively to the statement of fact at issue and the opposing party's response.  For clarity, the Court uses this citation form only for facts that are undisputed or deemed undisputed due to a party's failure to comply with Local Rule 56.1.

[2] Unum Group previously was known as UnumProvident.  (Defs. Resp. to Pl. L.R. 56.1 Stmt. ¶ 4.)

With some exceptions, the Policy pays a $15,000 Total Disability benefit per month,[3] beginning on the 91st day of disability in the period and continuing as long as the insured remains Totally Disabled, up to the applicable maximum benefit period outlined in the Policy. (*Id.* at 3-4, 6.)

Residual Disability benefits apply when, due to injury or sickness, the insured (1) is not able to do one or more of his "substantial and material daily business duties" or is not able to do his "usual daily business duties for as much time as it would normally take [him] to do it," (2) has a loss of monthly income in his occupation of at least 20%, and (3) is receiving care by a Physician which is appropriate for the condition causing the loss of monthly income.[4] (*Id.* at 9.) To qualify for Residual Disability benefits, the insured must suffer a loss of monthly income of at least 20% due to his disability. (*Id.* at 9.) If the insured loses over 75% of his prior monthly income due to disability, the Policy deems the insured to have suffered a total loss of income. (*Id.*) The Policy permits the insurer to require any proof it considers necessary to determine the insured's current and prior monthly incomes for purposes of calculating the Residual Disability benefit due, if any. (*Id.*)

Under the Policy, the insured's "occupation" is "the occupation (or occupations, if more than one) in which [the insured is] regularly engaged at the time [he] become[s] disabled." (*Id.*) If the insured's occupation "is limited to a recognized specialty within the scope of [his] degree or license," the Policy deems that specialty to be his occupation. (*Id.*) Plaintiff listed his occupation as "physician, MD" and his duties as "psychiatric diagnosis and treatment" in his application for the Policy. (Defs. L.R. 56.1 Stmt. ¶ 13.)

---

[3] The Policy initially provided a Total Disability benefit of only $9,500 per month with a 4% cost of living adjustment applied annually, but Plaintiff bought additional coverage effective September 7, 2001. (Pl. L.R. 56.1 Stmt. ¶ 10.)

[4] If the Residual Disability persists beyond a certain number of days, called the "Elimination Period," the insured no longer needs to have a loss of duties or time to receive Residual Disability benefits. (*Id.* at 9.)

## B.    Plaintiff's Disability Claim

In March 1998, Plaintiff was diagnosed with uveitis-associated retinal neovascularization of both eyes.  (Pl. L.R. 56.1 Stmt. ¶ 12.)  This condition causes swelling of the eye tissue, which can lead to blind spots, floaters, difficulty with depth perception, dizziness, difficulty focusing, and diminished peripheral vision.  (*Id.* ¶¶ 12-13.)  Plaintiff began experiencing significant vision loss due to his uveitis on January 1, 2003, which made it difficult for him to read charts, make notes, drive, and diagnose and treat patients.  (*Id.* ¶ 14.)

Plaintiff submitted a claim for disability benefits to Provident Life on May 27, 2003.  (*Id.* ¶ 19.)  Plaintiff reported that due to his uveitis he suffered from severe blind spots in both eyes, could not drive, and could not read or write normal print.  (*See* R. 78, Sec. Am. Compl. at Ex. B, Claim Application.)  Plaintiff's ophthalmologist, Dr. Gieser, submitted an Attending Physician Statement in support of Plaintiff's claim, confirming that Plaintiff suffered from "[d]iminished visual acuity and visual fields" and could not do "[a]nything requiring fine visual discrimination" or "[n]ight driving."  (Pl. L.R. 56.1 Stmt. ¶ 21.)

In his claim application, Plaintiff listed his occupation as "physician-psychiatrist" and described his duties at the time of his disability as "seeing patients at hospital[,] office and nursing homes" and serving as the "medical director of a psychiatric hospital."  (Claim Application at 4.)  Plaintiff disclosed that he had returned to work in February 2003 for about ten hours per week.  (Pl. L.R. 56.1 Stmt. ¶ 20.)  He reported that he had made $26,923.12 for the year as of May 9, 2003, and did not expect to make more than $70,000 in total for 2003.  (*Id.* ¶ 22.)  To prove his previous years' income for comparison purposes, Plaintiff submitted his W-2 forms for 2001 and 2002 with his application.  (*Id.* ¶ 19.)

A nurse employed by Provident Life conducted a medical review of Plaintiff's application on June 26, 2003. (*Id.* ¶ 25.) The nurse concluded that Plaintiff's "distance acuity would not be conducive to safe driving and . . . near acuities would not be conducive to reading small print or visualizing details with clarity." (*Id.*) Provident Life approved Plaintiff's Total Disability claim on July 18, 2003, with a disability date of January 1, 2003. (*Id.* ¶ 26; *see also* Defs. L.R. 56.1 Stmt. ¶ 18.) Provident Life then began paying Plaintiff monthly Total Disability benefits upon the expiration of the 90-day elimination period. (Defs. L.R. 56.1 Stmt. ¶ 18.)

### C.     Post-Claim Evaluation of Plaintiff's Disability Status

Provident Life continued to monitor Plaintiff's disability status and work activities following the approval of his claim. In August 2003, Provident Life interviewed Plaintiff to discuss his pre-disability occupational duties. (Pl. L.R. 56.1 Stmt. ¶ 28; Def. L.R. 56.1 Stmt. ¶ 19.) Plaintiff informed Provident Life's representative that he worked as a traveling geriatric psychiatrist and had a very large patient load with patients at over twenty facilities and located up to 100 miles from his home. (Pl. L.R. 56.1 Stmt. ¶ 28.) Plaintiff estimated that he drove 150 miles per day to see his patients. (*Id.*)

According to Defendants, Plaintiff stated during the interview that he primarily provided medical and medication management to his patients, that he had served as medical director of Rock Creek Psychiatric Hospital from 1996 through 2001, and that he worked with his brother as an associate psychiatrist in an office near his home. (Defs. L.R. 56.1 Stmt. ¶ 19; Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 19.) Plaintiff informed the field representative that, since his disability had begun, he had turned over some of his former patients to his brother and the rest to local psychiatrists and primary care physicians. (Defs. L.R. 56.1 Stmt. ¶ 19.) Plaintiff reported that he was no longer working in any capacity. (*Id.*)

On December 8, 2003, Provident Life completed an internal Vocational Review to determine whether Plaintiff could return to work with accommodations. (Pl. L.R. 56.1 Stmt. ¶ 29.) The consultant who conducted the review reported that Plaintiff's vision was "poor enough that he would need electronic large print reading devices to assist him in reading the medical records" and that such devices "are not portable enough to go from facility to facility and patient room to patient room." (*Id.*) The consultant also stated that even if the devices were more portable, Plaintiff's vision problems prohibited him from physically assessing his patients' appearance for potential side effects from their medications. (*Id.*) Additionally, the consultant found that Plaintiff's vision would cause "unsafe mobility in changing or unfamiliar environments" and an inability to "assess the safety of his environment if dangerous individuals were present." (*Id.*) Finally, the consultant noted that Plaintiff could not legally drive to see his patients. (*Id.*)

In addition to these assessments, Provident Life monitored Plaintiff's disability status through its review of monthly proof of loss statements Plaintiff submitted regarding his activity level and medical condition. (Def. L.R. 56.1 Stmt. ¶ 20.) From August 2003 to July 2006, Plaintiff reported in his monthly statements that he engaged in minimal activities, could not drive, and needed his wife to assist him with almost all activities.[5] (*Id.*) Plaintiff also reported on each statement that he had not been to his place of business and had not engaged in any work activity for pay, profit, or other compensation. (*Id.*) Defendants claim that, as they later

---

[5] Defendants repeatedly refer to instances in which their investigators observed Plaintiff driving despite his representation that his disability prevented him from driving. There is no dispute that Plaintiff could not legally drive in Illinois because of his disability. The extent to which Plaintiff broke the law and drove illegally is irrelevant to determining whether he could perform the duties of his occupation that required driving. *Cf. Rich v. Principal Life Ins. Co.,* 226 Ill. 2d 359, 371, 314 Ill. Dec. 795, 875 N.E.2d 1082 (Ill. 2007) (courts will not apply insurance policies in a way that contravenes public policy). While Plaintiff's driving activities may go to his credibility to the extent he represented to Defendants that he was not driving, the Court cannot assess Plaintiff's credibility at this stage.

discovered, the information Plaintiff provided in support of his disability claim was false in a number of respects.

First, Defendants' surveillance of Plaintiff revealed that Plaintiff visited the medical center in which his office is located on several occasions in July 2004, April 2005, and June 2008.  (*See* Defs. L.R. 56.1 Stmt. ¶¶ 21, 36.)  Plaintiff claims that he did not go to his office on these trips but, rather, visited the medical center itself, in which he owns a 9% ownership interest, as a landlord.  (Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 21.)  Defendants' surveillance also revealed that Plaintiff had driven on several occasions, even though he was not legally permitted to do so.  (Defs. L.R. 56.1 Stmt. ¶¶ 21, 36; *see also* Pl. L.R. 56.1 Stmt. ¶ 32.)

Second, Defendants claim that Plaintiff failed to disclose part-time work he performed for his brother's psychiatry practice in 2005 and 2006.  Plaintiff's brother, Dr. Saleem Choudhry, has a psychiatric practice in Columbus, Ohio that focuses on workers compensation claims.  (Pl. L.R. 56.1 Stmt. ¶ 35.)  In November 2005, a family emergency required his brother to leave the country for eight months.  (*Id.*)  Plaintiff covered his brother's practice for approximately three days per month between November 2005 and July 2006 while his brother was out of the country.  (*Id.* ¶ 37.)  According to Plaintiff, his position at his brother's practice primarily involved dictation and medication refills, rather than diagnosis and treatment of patients.  (*Id.* ¶ 38.)

Plaintiff claims that when he worked at his brother's practice, his other brother, Mahmood Choudhy, assisted Plaintiff with reading medical charts, entering data onto the computer system, documenting treatment notes, and other tasks that Plaintiff could not complete due to his disability.  (*Id.*)  Defendants, however, dispute this fact because Mahmood testified that although he helped Plaintiff read notes on a few occasions, he did not write notes, sit in

during patient visits, or travel to Ohio with Plaintiff. (*See* Defs. Resp. to Pl. L.R. 56.1 Stmt. ¶ 38; *see also* R. 99-7, M. Choudry Dep 24-29; Defs. L.R. 56.1 Stmt. ¶ 65.)

Plaintiff's monthly proofs of loss for December 2005 to June 2006 make no mention of the work he performed for his brother's practice. (Defs. L.R. 56.1 Stmt. ¶ 25.) According to Plaintiff, he did not disclose the work because the proof of loss statements required him to disclose only "work activity for payment, profit, or other compensation," and Plaintiff did not expect to receive any compensation for covering his brother's practice. (Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 25.) When Plaintiff's brother returned to the country, though, he paid Plaintiff $24,000 for having covered his practice. Plaintiff reported his work for his brother's practice and the $24,000 payment to Provident Life two days after receiving his brother's check. (Pl. L.R. 56.1 Stmt. ¶ 41.)

Third, Plaintiff was indicted on June 30, 2006 for several counts of Medicare fraud stemming from his activities from January 1999 to May 2002. (Defs. L.R. 56.1 Stmt. ¶ 24; Pl. L.R. 56.1 Stmt. ¶¶ 50-51.) The indictment charged that during this time period, Plaintiff had billed Medicare for more hours than he could perform in one day, charged for more complex services than he actually performed, and admitted patients to in-patient facilities even when not medically necessary to do so. (*Id.*) In April 2010, Plaintiff pled guilty to one count (Count Twelve) of Medicare fraud. (Defs. L.R. 56.1 Stmt. ¶ 40; Pl. Resp. to Defs. 56.1 Stmt. ¶ 40.) All counts in the indictment, including Count Twelve, concerned Medicare claims for reimbursement of services Plaintiff allegedly performed for patients admitted to Rock Creek Center in Lemont, Illinois.

Provident Life subsequently obtained evidence from the government concerning the work Plaintiff had performed for his brother's practice from 2004 to 2006, including the Current

Procedural Terminology ("CPT") codes Plaintiff billed during this time. (Defs. L.R. 56.1 Stmt. ¶ 41.) According to Defendants, the information Provident Life obtained from the government differed from the information Plaintiff previously provided about his work for his brother's practice. (*Id.*) Plaintiff, however, disputes the authenticity, accuracy, and materiality of the information Provident Life obtained from the government. (*See* Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 41.)

Fourth, Defendants contend that information they obtained during discovery in this litigation further undermines representations Plaintiff made to support his disability claim. (*See* Defs. L.R. 56.1 Stmt. ¶¶ 59-65.) Specifically, Defendants contend that they learned through discovery that Plaintiff continued to "routinely" see several patients throughout 2003 and 2004, which Plaintiff did not disclose in his monthly proofs of loss. (*See id.*) Plaintiff admits that during this period he continued to see five or six patients while he transitioned them to a new doctor. (Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶¶ 62-63.) Plaintiff contends, however, that he disclosed this work in his claim application, in which he stated that he had continued to work ten hours per week, and that the monthly proofs of loss did not require him to report this work because he did not receive compensation for it. (*Id.* ¶¶ 60-61.)

## D. Reevaluation of Plaintiff's Disability Claim in 2006-2007

In August 2006, after learning of the part-time psychiatric work Plaintiff had performed from December 2005 to June 2006, Provident Life informed Plaintiff that it was reevaluating his eligibility for Total Disability benefits during that time period. (*See* Pl. L.R. 56.1 Stmt. ¶ 42; Second Am. Compl. Ex. J, 8/22/2006 Ltr.) Provident Life asked Plaintiff to provide additional documentation to support his disability claim. (*See* Pl. L.R. 56.1 Stmt. ¶ 43; 8/22/2006 Ltr.) Plaintiff provided the requested information shortly thereafter. (Pl. L.R. 56.1 Stmt. ¶ 44.)

According to Defendants, however, the supplemental materials Plaintiff submitted continued to misrepresent his pre- and post-disability work activities. (*See* Defs. Resp. to Pl. L.R. Stmt. ¶ 44; Defs. L.R. 56.1 Stmt. ¶¶ 40-45, 67.)

Provident Life referred Plaintiff's claim to its Financial Consulting Unit in October 2006. (Pl. L.R. 56.1 Stmt. ¶ 48.) Two months later, Provident Life informed Plaintiff that it was considering administering his claim as one for Residual Disability benefits, rather than Total Disability benefits, and, as a result, it needed to understand how the allegations in his indictment for Medicare fraud affected his pre-disability earnings. (*Id.* ¶ 49.) Provident Life requested more information from Plaintiff in December 2006, and it continued to conduct surveillance of Plaintiff while it reevaluated his claim. (*See* Pl. L.R. 56.1 Stmt. ¶¶ 49, 53-54; Defs. Resp. to Pl. L.R. 56.1 Stmt. ¶¶ 53-54.)

In its December 2006 letter to Plaintiff, Provident Life notified Plaintiff that it had become aware of his indictment for Medicare fraud. (*See* Pl. L.R. 56.1 Stmt. ¶ 49.) Provident Life informed Plaintiff that the indictment called into question the accuracy of the tax returns and other information Plaintiff had submitted in support of his insurance application and disability claim. (*See* 12/12/06 Ltr. at PLA-CL-NL4197253-00862-63.) Provident Life requested that Plaintiff allow it to obtain information about Plaintiff's criminal case directly from the prosecutor working on the case. (*Id.*)

In April 2007, Provident Life completed a Vocational Review in which it analyzed Plaintiff's pre-disability occupation through his billing codes and compared his pre-disability billing codes to the billing codes Plaintiff used while working at his brother's practice in 2005-2006. (*Id.* ¶ 55.) Provident Life concluded that Plaintiff's pre-disability billing codes were consistent with Plaintiff's description of his occupation as a geriatric psychiatrist who traveled to

nursing homes and hospitals to see patients. (Defs. L.R. 56.1 Stmt. ¶ 34.) In performing the analysis, Provident Life's vocational consultant accepted Plaintiff's explanation about his ability to work with assistance at his brother's practice and accepted Plaintiff's description of his pre-disability duties. (*Id.*)

On April 24, 2007, Provident Life removed its reservation of rights on Plaintiff's benefit payments. (*Id.* ¶ 35.) Provident Life notified Plaintiff that although it was removing its reservation of rights, it would continue to monitor the status of his indictment and request updated information from him. (*Id.*) Provident Life also reminded Plaintiff that he must continue to submit monthly proofs of loss in order to receive benefits. (*Id.*) Finally, Provident Life stated that "[a]t this time, we are ceasing efforts to further pursue your federal income tax returns, however, we reserve the right to request, obtain and review this information in the event circumstances warrant further review of your pre-disability earnings." (*See* 4/24/07 Ltr. at PLA-CL-NL4197253-001321.)

### E. Plaintiff Pleads Guilty to Healthcare Fraud

On April 14, 2010, Plaintiff pled guilty to one count of healthcare fraud in violation of 18 U.S.C. § 1347. *See United States v. Chaudhry,* No. 06-cr-469 (N.D. Ill.) at R. 60. The count to which Plaintiff pled guilty, Count Twelve, alleged that Plaintiff had knowingly and willfully executed a scheme to defraud Medicare by causing Medicare to reimburse him for fraudulent claims submitted on August 31, 2001. *See id.* at R. 1. On June 29, 2012, the district court sentenced Plaintiff to thirty-seven months imprisonment and two years of supervised release, and ordered Plaintiff to pay restitution in the amount of $428,884.00. (*See* R. 99-13.) The government dismissed the remaining counts against Plaintiff.

**F.     Reevaluation of Plaintiff's Disability Claim in 2010 and 2011**

In June 2010, Provident Life obtained documents from the government concerning Plaintiff's work activities from 2004-2006.  (*See* Defs. L.R. 56.1 Stmt. ¶ 41.)  Among the documents Provident Life received were what Defendants contend are the CPT codes for which Plaintiff billed during that time period.  (*Id.*)  The billing records Provident Life obtained from the government differed from the billing information Plaintiff previously had provided to Provident Life.  (*Id.*)  Plaintiff challenges the admissibility of the billing documents on hearsay and authentication grounds (*see* Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 41), but he does not challenge that Defendants received these records from the government or that the records differed from the information Plaintiff had previously disclosed.  (*See id.*)

Provident Life provided the new billing records to a vocational expert and asked her to compare Plaintiff's job duties, as evidenced in those documents, with Plaintiff's pre-disability job duties.  (*See* Defs. L.R. 56.1 Stmt. ¶ 42.)  The vocational expert concluded that because Plaintiff had pled guilty to Medicare fraud, the billing codes he had provided in 2003 regarding his pre-disability work were inaccurate and inflated.  (*Id.*)  The vocational expert noted that "[i]t seems very likely that charges billed in 2006 during the post-disability period are also inflated." (*Id.; see also* PLA-CL-NL4197253-002545.)  Additionally, the vocational expert reported:

> A significant determination during the early handling of [Plaintiff's] claim was that the insured was precluded, due to visual impairment, from driving to see patients in the hospital and nursing homes.  We now learn that he admitted patients to Rock Creek psychiatric hospital who did not need such services which allowed him to bill for hospital evaluation and treatment.  It is not even clear that he provided the services.

> If we accept the 2006 charges at face value, these are for seeing patients within an office which would not require driving.  However, he reported that he received assistance for reading and documenting charts and for data entry.  These services are not the same as the services the insured provided prior to disability which involved traveling to Rock Creek Hospital, where he was Assistant Medical Director, and nursing homes.

In conclusion, it appears that there are no accurate records to allow us to compare pre and post disability work activities. Until the insured provides accurate records, we are not able to make any accurate assessment of loss of duties or loss of income.

(*See* PLA-CL-NL4197253-002545.)

In a follow-up report, the vocational expert specifically compared the billing codes Plaintiff purportedly used in 2004-2006 with those he used in 2001-2002. (*See* PLA-CL-NL4197253-002550-51.) She noted that, in both periods, Plaintiff billed for psychiatric diagnostic interviews, individual psychotherapy, and pharmacologic management. (*Id.*) She also noted, however, that Plaintiff billed for hospital care and nursing home evaluation and treatment in 2001-2002 but not in 2004-2006. (*Id.*) The vocational expert concluded that Plaintiff "perform[ed] important duties of a psychiatrist in 2004 to 2006." (*Id.*) The vocational expert also raised doubts about Plaintiff's description of his pre-disability occupation as a geriatric psychiatrist, noting that: "[s]ervices billed under 99311-13 [for nursing home evaluation and treatment] indicate that [Plaintiff] did provide nursing home care prior to disability. However, he also saw patients in his office and within a hospital and these codes provide no indication as to the age of the patient." (*Id.*)

In early 2011, Provident Life scheduled Plaintiff to receive an independent medical examination ("IME") to evaluate his ability to perform his job duties with the help of assistive devices such as electronic magnifiers and adaptive software. (*See* Defs. L.R. 56.1 Stmt. ¶ 48; Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 48.) The independent physician who examined Plaintiff, Dr. John Coalter, determined that "[s]ustainable reading is possible combining such an Rx and a desktop CCTV electronic magnifier as well as adaptive software at any computer system." (*See* Defs. L.R. L.R. 56.1 Stmt. ¶ 48; Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 48; *see also* PLA-CL-NL4197253-003259.) Dr. Coalter recommended that Plaintiff complete a full vision

rehabilitation program to discover the full range of aids that would allow him to make the most of his permanently impaired vision. (*See* PLA-CL-NL4197253-003260.) Dr. Coalter concluded that "[t]hough [Plaintiff] will not be able to ever work the way in which he once did doing regional travel/driving all hours of the day and night – there may be fulfilling vocation/avocation that he might be able to better do with some of the abilities, knowledge, and professional credentials he has earned on a far more limited basis." (*Id.*) Additionally, Dr. Coalter reported that Plaintiff may have a reduced ability to work because of increased visual fatigue, and Plaintiff would need training to teach him how to handle "mobility issues associated with inferior visual field losses if [he] is to have safe, independent mobility." (*Id.*)

### G.     Termination of Plaintiff's Disability Benefits in August 2011

On August 12, 2011, Provident Life notified Plaintiff that it was terminating his disability benefits effective immediately. Provident Life sent Plaintiff a letter explaining the termination of his benefits on August 15, 2011. (*See* Defs. L.R. 56.1 Stmt. ¶ 50; *see also* PLA-CL-NL4197253-003345-54, Termination Ltr.) In the letter, Provident Life informed Plaintiff that it should have administered Plaintiff's claim under the Residual Disability provisions rather than the Total Disability provisions of the Policy from March 2, 2004 to the present. (Termination Ltr. at 2.) Under the Residual Disability provision, the Policy provides benefits only if the disability causes a loss in monthly income of at least 20%. (*See* Policy at 9-10.) Provident Life asserted that because Plaintiff's pre-disability earnings from 1999-2002 were, in part, fraudulent and inflated, Provident Life could not accurately calculate Plaintiff's loss in monthly income or determine whether Residual Disability benefits were due. (*See* Termination Ltr. at 7.) Additionally, Provident Life asserted that the allegations in Plaintiff's indictment and his guilty plea to Count Twelve of the indictment called into question the accuracy of the tax returns Plaintiff submitted

for 1999-2002 and the information Plaintiff had previously provided about his pre-disability duties.  (*See id.*)  Provident Life concluded that, for these reasons as well as other inaccuracies in the information Plaintiff had provided, "[n]o further benefits [were] payable under [Plaintiff's] claim."  (*Id.* at 2.)[6]

### H.     Procedural History

On July 24, 2012, Plaintiff filed suit against Defendants for breach of contract, unreasonable and vexatious conduct based on their termination of his benefits, and declaratory relief that Plaintiff is entitled to all future benefits under the Policy.  (*See* R. 1, Compl. ¶ 1.) Plaintiff later amended his complaint to add two additional counts for declaratory relief stating that (1) Defendants waived the defense of mistake regarding their prior admission of Total Disability coverage, and (2) Defendants are estopped from asserting the defense of mistake and arguing that Plaintiff's benefits should be administered under the Residual Disability benefit provision of the Policy.  (*See* Sec. Am. Compl. ¶¶ 69-86.)  Both parties have moved for summary judgment.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In determining summary judgment motions, the facts "must be viewed in the light most favorable to the nonmoving party . . . if there is a 'genuine' dispute as to those facts."  *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L.

---

[6] The Court discusses additional facts below where relevant to the parties' motions.

Ed. 2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to the material facts. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 255 (quotation omitted). The responding party "must begin to meet this burden by submitting admissible, supporting evidence in response to [the movant's] proper motion for summary judgment." *Harney v. City of Chicago,* 702 F.3d 916, 925 (7th Cir. 2012).

## ANALYSIS

Plaintiff asserts five counts against Defendants: (1) breach of contract; (2) unreasonable and vexatious conduct; (3) declaratory relief that Defendants have waived the defense of mistake regarding their prior admission of Total Disability coverage; (4) declaratory relief that Defendants are estopped from raising the defense of mistake regarding their prior admission of Total Disability coverage; and (5) declaratory relief that Plaintiff is entitled to all future benefits under the Policy. (*See* Second Am. Compl. ¶¶ 44-86.) Plaintiff and Defendants have filed cross-motions for summary judgment with respect to all five counts. Additionally, Defendants argue that even if the Court does not grant summary judgment to Provident Life, it should grant summary judgment to Unum Group because Unum Group is not a party to the Policy.[7]

---

[7] Defendants also filed a motion to strike, seeking to strike from Plaintiff's summary judgment submission (1) Exhibits 3-6 regarding a multistate report and regulatory settlement agreement involving Defendants, (2) paragraph 7 of Plaintiff's affidavit, which Defendants argue contradicts Plaintiff's deposition testimony, and (3) any statements of facts and arguments that rely on the challenged materials. (*See* R. 155, Mot. to Strike.) The Court addresses Defendants' motion to strike Exhibits 3-6 and related statements of fact and arguments in Part II, *infra.* The Court need not decide Defendants' motion to strike paragraph 7 of Plaintiff's affidavit and related materials because, regardless of whether the Court considers these materials, genuine issues of fact remain regarding whether Defendants breached the Policy by terminating Plaintiff's benefits. The Court, therefore, denies as moot Defendants' motion to strike paragraph 7 of Plaintiff's affidavit and any related statements of fact and arguments.

# I.	Breach of Contract

In Count I, Plaintiff claims that Defendants breached the Policy by wrongfully terminating his disability benefits in August 2011.  Defendants, on the other hand, claim that Provident Life properly terminated Plaintiff's benefits because Plaintiff was only Residually Disabled, not Totally Disabled, and Provident Life could not determine whether Plaintiff's loss of income qualified him to receive Residual Disability benefits due to his admitted fraud.  Before evaluating whether a genuine dispute exists on Count I, the Court must determine the meaning of the relevant Policy provisions.

## A.	Policy Construction

The parties agree that Illinois law governs Plaintiff's breach of contract claim.  (*See* Defs. Mem. at 3-4.)  Under Illinois law, the construction of an insurance policy is a question of law. *See Empire Indem. Ins. Co. v. Chicago Province of Soc'y of Jesus,* 2013 IL App (1st) 112346, ¶ 35, 371 Ill. Dec. 657, 990 N.E.2d 845 (Ill. App. Ct. 2013).  In construing the Policy, the Court's primary objective is "to ascertain and give effect to the intentions of the parties as expressed in their agreement."  *National Cas. Co. v. White Mountains Reinsurance Co. of Am.,* 735 F.3d 549, 556 (7th Cir. 2013) (quoting *McKinney v. Allstate Ins. Co.,* 188 Ill. 2d 493, 243 Ill. Dec. 56, 722 N.E.2d 1125, 1127 (Ill. 1999)).  The Court must construe the Policy as a whole and in light of "the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract."  *Gaudina v. State Farm Mut. Auto. Ins. Co.,* 2014 IL App (1st) 131264, ¶ 17, 380 Ill. Dec. 418, 8 N.E.2d 588 (Ill. App. Ct. 2014).

If the terms of the Policy are clear and unambiguous, the Court must give them their plain and ordinary meaning.  *See National Cas. Co.,* 735 F.3d at 556 (quoting *McKinney,* 188 Ill. 2d 493, 243 Ill. Dec. 56, 722 N.E.2d at 1127).  If, on the other hand, "the terms are susceptible to

more than one meaning, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy." *Id.* The Court, however, will not strain to find ambiguity where none exists. *See id.* "Although 'creative possibilities' may be suggested, only reasonable interpretations will be considered." *Hanson v. Lumley Trucking, LLC,* 403 Ill. App. 3d 445, 447, 342 Ill. Dec. 718, 932 N.E.2d 1179 (Ill. App. Ct. 2010) (*Bruder v. Country Mut. Ins. Co.,* 156 Ill. 2d 179, 193, 189 Ill. Dec. 387, 620 N.E.2d 355 (Ill. 1993)).

The Policy here defines Totally Disabled, in relevant part, to mean that the insured, due to injury or sickness, is unable to perform the "substantial and material duties of [his] occupation." (*See* Policy at 4.) Residually Disabled, on the other hand, means that the insured is unable to perform one or more of his "substantial and material daily business duties" or is unable to perform those duties "for as much time as it would normally take [him] to do them." (*Id.* at 9.) For Total Disabilities, the Policy provides a set monthly benefit of $15,000. (*See id.* at 3-4, 6.) For Residual Disabilities, the Policy calculates the monthly benefit based on the insured's loss of monthly income due to his disability. (*Id.* at 9-10.) The insured must have a loss of monthly income of at least 20% to qualify for Residual Disability benefits, and if the loss of monthly income exceeds 75%, the Policy considers it a total loss of income. (*Id.* at 9.)

Defendants argue that the Court should read the Total Disability and Residual Disability provisions together as creating a continuum of coverage. According to Defendants, the Residual Disability provisions cover an insured who can perform some but not all of his "substantial and material" duties, and the Total Disability provisions take effect only when the insured cannot perform even a single one of his "substantial and material" duties. (*See* Defs. Mem. at 7.) Plaintiff argues that Defendants' interpretation ignores the difference in the language of the Total and Residual Disability provisions. Under Plaintiff's interpretation, an insured's inability to

perform even one "substantial and material" duty of his occupation renders him Totally Disabled.  (*See* Pl. Mem. at 7-8.)  The Court agrees with Defendants that it should interpret the Total Disability and Residual Disability provisions in conjunction, but disagrees that the Total Disability provisions apply only if the insured cannot perform even a single one of his "substantial and material" duties.

The Seventh Circuit's analysis in *McFarland v. General American Life Insurance Co.,* 149 F.3d 583 (7th Cir. 1998), is instructive.  In *McFarland,* the Seventh Circuit interpreted the meaning of the phrase "unable to perform the material and substantial duties of your regular occupation" and determined that "[t]he policy language could be reasonably interpreted to cover both qualitative and quantitative reductions in one's performance as a result of an injury or sickness." *Id.* at 588.  A qualitative reduction occurs when an insured can no longer perform "one core and essential aspect of his job" as a result of an injury or disability.  *Id.*  A quantitative reduction, on the other hand, occurs when a disability does not "physically prevent an employee from performing any given task, but the injury instead renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation."  *Id.*

The Seventh Circuit used the example of a baseball player who could no longer throw to illustrate a qualitative reduction that would amount to a total disability:

> [I]f a shortstop, whose principal duties include running, hitting, catching, and throwing, were injured such that he could no longer throw, he would be totally disabled because he could no longer be employed as a shortstop.  Even though the shortstop could still run, hit and catch (a significant portion of his duties), throwing is an essential function for a shortstop and thus the inability to throw means that he is unable to perform "the material and substantial duties" of his occupation. . . .
>
> . . . .

This disability, while affecting only one of several core skills, would be enough to prevent him from continuing to perform as a shortstop. We agree with [the insurer] that a person purchasing disability insurance with the definition of totally disabled at issue here would reasonably expect that, if he was no longer able to perform an essential duty of his regular occupation, resulting in the loss of his position, he would be "totally disabled."

*Id.* With respect to a total disability due to quantitative reductions, the Seventh Circuit found that, under a reasonable interpretation of the policy language at issue, the policy would provide total disability coverage where a person can still perform their usual tasks but the person "is reduced perhaps to 25% of the prior output." *Id.*

As Provident Life points out, the insurance policy in *McFarland,* unlike the Policy at issue in this case, did not contain separate residual disability coverage. The Seventh Circuit's discussion of quantitative reductions in performance fits squarely into the Policy's description of Residual Disability benefits. The Seventh Circuit's discussion of qualitative reductions in performance, however, remains pertinent to the Policy's Total Disability provisions. As in *McFarland,* the Court finds that a person purchasing the Policy at issue here would reasonably expect that if he could no longer perform an essential duty of his regular occupation, resulting in his inability to serve in that occupation, he would qualify for Total Disability benefits under the Policy. *See id.* Accordingly, the insured's inability to perform even one essential duty of his occupation, if that inability completely precludes him from serving in his occupation, satisfies the definition of Total Disability. The insured need not establish that he is unable to perform *all* of the substantial and material duties of his occupation to qualify for Total Disability benefits under those circumstances.

Defendants rely on *Dym v. Provident Life and Accident Insurance Co.,* 19 F. Supp. 2d 1147 (S.D. Cal. 1998), and several cases citing *Dym* in arguing for the opposite result. In *Dym,* the district court considered the same policy language applicable in this case and determined that

to qualify for Total Disability benefits, the insured must be unable to perform *all*—not just one—of the substantial and material duties of his occupation. *Id.* at 1150. The court reasoned:

> A comparison of the [definitions of total disability and residual disability] suggests that the phrase "you are not able to perform the substantial and material duties of your occupation" as used in the "total disability" definition cannot reasonably be read as "you are not able to perform one or more of the substantial and material duties of your occupation," because if such a reading was intended, the language "one or more" would have been used, as it is in the "residual disability" definition.

*Id.* The court in *Dym* ultimately held that the insurer did not breach the policy by refusing to continue to make payments to the plaintiff under the Total Disability provisions of his policies because the plaintiff "continues to be able to perform one of the substantial material duties of his occupation." *Id.*

The Court does not find the reasoning in *Dym* persuasive. If the parties intended for the Total Disability provisions to apply only when the insured is unable to perform "all" of his or her substantial and material duties, Provident Life easily could have included "all" in the definition of Total Disability. *See Gross v. UnumProvident Life Ins. Co.,* 319 F. Supp. 2d 1129, 1136 (C.D. Cal. 2004). Provident Life, however, did not do so. "[T]hat the insurer did not write 'one or more' in the total disability clause does not compel the conclusion that the total disability provision impliedly includes the word 'all.'" *Id.*

Furthermore, even if the Policy is ambiguous as to whether the insured must be unable to perform *all* of the substantial and material duties of his or occupation before he can receive Total Disability benefits, the Court must resolve that ambiguity in favor of the insured.[8] *See National*

---

[8] Under Illinois law, the interpretation of an ambiguous insurance policy remains a question of law for the court to decide as long as the extrinsic evidence, if any, is undisputed. *See Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 456 (7th Cir. 1991); *Shaltiel v. Fortis Ins. Co.,* 345 F. Supp. 2d 912, 914 (N.D. Ill. 2004). In this case, the parties rely exclusively on the language of the Policy and have not introduced any extrinsic evidence related to the interpretation of the Policy. Thus, even if the Policy is ambiguous, the interpretation of the Policy is a question of law that the Court may properly decide on summary judgment.

*Cas. Co.,* 735 F.3d at 556 (quoting *McKinney,* 188 Ill. 2d 493, 243 Ill. Dec. 56, 722 N.E.2d at 1127). Accordingly, the Court interprets the Policy as providing Total Disability benefits where the insured's disability prevents him from performing an essential duty of his regular occupation, resulting in a complete inability to serve in that occupation, even if the insured is still able to perform other "substantial and material" duties of his occupation. *See McFarland ,* 149 F.3d at 588; *see also Dowdle v. National Life Ins. Co.,* 407 F.3d 967, 972 (8th Cir. 2005) (holding that the insured was totally disabled under similar policy language where he could no longer perform "the most important substantial and material duty of [his] occupation as an orthopedic surgeon").

**B.       Breach of the Policy**

Although the Court has determined that Plaintiff could qualify as Totally Disabled under the Policy even though he still has the ability to perform some of his substantial and material pre-disability duties, factual disputes and credibility issues prevent the Court from deciding on summary judgment whether Defendants' termination of Plaintiff's benefits breached the Policy. In deciding whether the Policy entitles Plaintiff to receive Total or Residual Disability benefits, the trier of fact must make several factual determinations, including (1) what Plaintiff's occupation was at the time he became disabled (*see* Policy at 4), (2) what his "substantial and material" duties were when he became disabled (*see id.* at 4, 9), (3) whether he could perform those duties after his disability (*see id.*), and (4) in the case of Residual Disability, the loss of income attributable to Plaintiff's disability (*see id.* at 9-10). Most of the evidence regarding Plaintiff's "substantial and material" duties, his ability to perform them, and his pre- and post-disability income comes from Plaintiff's own testimony and documents and other information Plaintiff provided to Provident Life before this litigation began. The necessary factual inquiries,

therefore, rest largely, if not entirely, on the trier of fact's evaluation of Plaintiff's credibility and the reliability of the information he provided to Provident Life in support of his claim.

It is well-established that "credibility determinations are inappropriate on summary judgment." *Walker v. Sheahan,* 526 F.3d 973, 980 (7th Cir. 2008); *Cameron v. Frances Slocum Bank & Tr. Co.,* 824 F.2d 570, 575 (7th Cir. 1987) ("On summary judgment, a court can neither make a choice between competing inferences nor make a credibility determination."). Accordingly, "[i]f the credibility of [a] movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial," because such a situation "presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact." *Cameron,* 824 F.2d at 575 (quoting 10A C. Wright & M. Kane, Federal Practice & Procedure § 2726 (2d ed. 1983)). The mere prospect of challenging a witness's credibility alone is not enough to avoid summary judgment. *See Dugan v. Smerwick Sewerage Co.,* 142 F.3d 398, 406 (7th Cir. 1998). Where a witness repeatedly contradicts himself under oath on material matters or where his or her testimony is "riddled with blatant inconsistencies," however, the witness's credibility becomes an issue for the jury. *See Allen v. Chicago Transit Auth.,* 317 F.3d 696, 699-700 (7th Cir. 2003); *Perfetti v. First Nat'l Bank,* 950 F.2d 449, 456 (7th Cir. 1991); *Cameron,* 824 F.2d at 575.

Here, Defendants have provided ample reason to question Plaintiff's credibility and the reliability of the information he provided. To begin with, Plaintiff pled guilty to Medicare fraud involving a scheme to bill Medicare for services he did not perform and for more complex services than actually provided. Plaintiff's admitted fraud casts doubt not only on the credibility of his testimony, but on the reliability of his representations regarding his "substantial and material" duties at the time of his disability and the reliability of the documents he submitted

regarding his pre-disability income.  *See* Fed. R. Evid. 608, 609(a)(2).  Plaintiff's failure to

disclose information regarding his pre- and post-disability work activities until pressed further

and inconsistencies in his deposition testimony further undermine his credibility and call into

question the accuracy of the information he provided to Provident Life in support of his claim.[9]

In some instances, Plaintiff has offered potentially plausible explanations regarding why he

initially failed to disclose information to Provident Life.  Plaintiff's proffered explanations,

however, simply highlight the need for the trier of fact to make credibility determinations before

resolving Plaintiff's claim.  This need and the need to resolve factual disputes regarding whether

Plaintiff is Totally Disabled (as he claims) or only Residually Disabled (as Defendants claim)

and, in the latter case, whether his disability caused him to lose enough monthly income to

qualify for Residual Disability benefits preclude the Court from granting summary judgment to

either party on Plaintiff's breach of contract claim.  *See, e.g., Allen,* 317 F.3d at 699-700;

*Perfetti,* 950 F.2d at 456; *Cameron,* 824 F.2d at 575.  The Court, therefore, denies the parties'

summary judgment motions with respect to Count I.

## II.     Unreasonable and Vexatious Conduct

Pursuant to 215 ILCS 5/155. a court may award attorney's fees, costs, and an additional

penalty to an insured if the court determines that the insurer's denial of liability, dispute of the

amount of the loss payable, or delay in settling a claim was "vexatious and unreasonable."  *See*

215 ILCS § 5/155; *John T. Doyle Tr. v. Country Mut. Ins. Co.,* 2014 IL App (2d) 121238 ¶ 28,

---

[9] In their Answer to the Second Amended Complaint, Defendants asserted a counterclaim against Plaintiff for fraud, seeking reimbursement of the disability benefits Defendants had paid to Plaintiff in reliance on Plaintiff's alleged misrepresentations and omissions regarding his work activities and income.  (*See* R. 80 at 29-32.)  The Court dismissed Defendants' counterclaim as untimely on December 18, 2013 in part because after the close of discovery would unduly prejudice Plaintiff.  (*See* R. 108.)  Although the Court's Order prevented Defendants from asserting a counterclaim against Plaintiff for fraud, it did not preclude Defendants from raising Plaintiff's submission of allegedly fraudulent information and documents as a coverage defense, if appropriate.

380 Ill. Dec. 320, 8 N.E.3d 490 (Ill. App. Ct. 2014). The determination of whether an insurer's

actions were vexatious and unreasonable is within discretion of the district court and may be an

appropriate issue for summary judgment even if factual disputes prevent summary judgment on

the issue of coverage. *See Medical Protective Co. v. Kim,* 507 F.3d 1076, 1086 (7th Cir. 2007);

*LaDonne v. AXA Equitable Life Ins. Co.,* No. 05 C 1151, 2009 WL 3721038, at *7 (N.D. Ill.

Nov. 2, 2009). In determining whether an insurer's conduct rose to the level of vexatious and

unreasonable, the Court must consider the "totality of the circumstances." *See TKK USA, Inc. v.

Safety Nat. Cas. Corp.,* 727 F.3d 782, 793 (7th Cir. 2013).

A wrongful denial of coverage, by itself, is not enough to warrant penalties for vexatious

and unreasonable conduct. *See Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.,* 200

F.3d 1102, 1110 (7th Cir. 2000); *see also Rosalind Franklin Univ. of Med. & Sci. v. Lexington

Ins. Co.,* 2014 IL App (1st) 113755 ¶¶ 108-18, 380 Ill. Dec. 89, 8 N.E.3d 20 (Ill. App. Ct. 2014);

*Bernstein v. Genesis Ins. Co.,* 90 F. Supp. 2d 932 (N.D. Ill. 2000). Rather, the denial must be

"willful and without reasonable cause." *See Citizens First Nat'l Bank of Princeton,* 200 F.3d at

1110. Accordingly, an insurer's denial of coverage is not vexatious and unreasonable if

> (1) there is a *bona fide* dispute concerning the scope and application of insurance
> coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents
> a genuine legal or factual issue regarding coverage; or (4) the insurer takes a
> reasonable legal position on an unsettled issue of law.

*TKK USA, Inc.,* 727 F.3d at 793; *John T. Doyle Tr.,* 2014 IL App (2d) 121238 ¶ 28, 380 Ill. Dec.

320, 8 N.E.3d 490.

Plaintiff claims that Defendants' termination of his disability benefits was vexatious and

unreasonable because Defendants (1) misrepresented Plaintiff's pre-disability occupation and

post-disability work activities in determining that he is Residually Disabled, (2) made

unsupported coverage decisions based on Plaintiff's ability to drive even though Plaintiff could

not legally drive due to his vision loss, (3) attempted to interfere with the independent medical examiner's evaluation of Plaintiff's disability status, (4) conducted harassing surveillance of Plaintiff, and (5) discriminated against Plaintiff based on his religion and national origin. None of these arguments, even considered as a whole, however, warrant imposing sanctions on Defendants for vexatious and unreasonable conduct.

### A.      Defendants' Determination that Plaintiff Is Residually Disabled

First, Plaintiff claims that Defendants acted vexatiously and unreasonably because they misrepresented his pre-disability occupation and post-disability work activities in order to justify reevaluating his claim under the Residual Disability provisions of the Policy. Plaintiff relies on *Stender v. Provident Life and Accident Insurance Co.,* No. 98 C 1056, 2001 WL 811159 (N.D. Ill. July 17, 2001), in support of this argument. (*See* Pl. Resp. Br. at 24.) The plaintiff in *Stender* was a commodities pit scalper whose career came to an end when his hearing and speech deteriorated to the point that he could no longer hear or yell loudly enough to make trades in the pits. *See Stender*, 2001 WL 811159, at *2. After leaving his job as a commodities pit scalper, the plaintiff began trading commodities from his home. Despite his off-the-floor commodities trading, Provident Life paid the plaintiff total disability benefits for the first four years of his disability. *Id.* at *3. In the fifth year, however, a new claims adjuster began handling the plaintiff's file. The new adjuster took the position that "[a] trader is a trader" and, therefore, the plaintiff was still performing his occupation even though he had shifted from on-the-floor to off-the-floor trading. *Id.* at *4-5. Provident Life then re-interviewed the plaintiff, and ultimately determined that it should administer his claim as one for residual disability benefits rather than total disability benefits. *Id.* at *5.

The district court found that Provident Life's "sudden turnabout" in its treatment of the plaintiff's claim was vexatious and unreasonable. *Id.* In making this determination, the court emphasized that between Provident Life's initial determination that the plaintiff was totally disabled and its reclassification of his disability as residual several years later, "[t]here [was] no change in the description of what [the plaintiff] was doing, nor [was] there any new material information as to what he did prior to the claim." *Id.* Rather, the only reason for Provident Life's about-face was the new adjuster's opinion that "a trader is a trader." *Id.* The court held that because Provident Life "had nothing more upon which to base its sudden turnabout . . . it [lacked] any factual basis for rejecting the definition of occupation contained in the application for the policy and which it had previously accepted," and, therefore, its actions were vexatious and unreasonable. *Id.* Put differently, the court found that Provident Life was "not entitled merely to change its mind for no good reason." *Id.*

*Stender* is factually distinguishable from the present case. Here, unlike in *Stender,* Provident Life based its reevaluation of Plaintiff's disability status on new developments that provided additional information about Plaintiff's post-disability work activities and called into question the reliability of information Provident Life previously had received from Plaintiff. Between Provident Life's reevaluation of Plaintiff's disability status in 2007 and its termination of his benefits in 2012, Plaintiff had pled guilty to Medicare fraud and Provident Life had obtained records from the government showing that Plaintiff's representations about his post-disability work were incomplete and misleading. Unlike *Stender*, this is not a case in which an insurer merely changed its mind for no good reason.

Plaintiff argues that Defendants' reliance on his guilty plea and the billing codes Provident Life obtained from the government is improper. (*See* Pl. Mem. at 13-15.) To begin

with, Plaintiff challenges the admissibility of the billing codes on hearsay and authenticity grounds. The Court overrules both objections for purposes of deciding Plaintiff's vexatious and unreasonable claim. Plaintiff's hearsay objection is without merit because Defendants do not offer the billing codes for the truth of the matter with respect to Plaintiff's vexatious and unreasonable claim. Rather, Defendants use the billing codes to show that they had reasonable cause to reclassify Plaintiff as being Residually Disabled rather than Totally Disabled. In other words, Defendants offer the billing codes to prove their state of mind, not to prove the truth of the matter.[10] The Court, therefore, overrules Plaintiff's hearsay objection.

The Court overrules Plaintiff's authentication objection for similar reasons. Although Plaintiff challenges whether the billing codes the government provided Provident Life are, in fact, the codes Plaintiff submitted for his work in 2004-2006, Plaintiff does not challenge that the billing codes are the codes Provident Life obtained from the government. Defendants, moreover, have submitted a declaration from Peter Theiler, one of the special agents who investigated Plaintiff for Medicare fraud, attesting that he provided the billing codes at issue, which he obtained from Ohio Bureau of Workers Compensation, to Provident Life in May 2010. (*See* R. 126-2.) Mr. Theiler's declaration, combined with Provident Life's authentication of its claim file, is sufficient at this stage to support a finding that the billing codes are what Defendants claim they are—*i.e.,* the billing codes that the government provided to Provident Life and on which Provident Life relied in terminating Plaintiff's benefits. *See* Fed. R. Evid. 901(a)-(b)(1). The Court, therefore, overrules Plaintiff's authentication objection.[11]

---

[10] Defendants offer the billing codes for the truth of the matter—*i.e.,* to establish Plaintiff's post-disability work activities—for purposes of defending against Plaintiff's breach of contract and waiver claims. The Court does not, and need not, determine whether the billing codes are admissible to prove the truth of the matter at this point. (*See* note 15, *infra.*)

[11] The Court does not and need not determine at this point whether Defendants have properly authenticated the billing codes as the codes that Plaintiff actually submitted for his work in 2004-2006.

Plaintiff next contends that the billing codes Provident Life obtained from the government did not materially differ from the billing codes Plaintiff already had provided to Provident Life. Thus, Plaintiff argues, even if the new billing codes are accurate, they did not justify reclassifying Plaintiff's disability under the Residual Disability provisions of the Policy. Regardless of whether the trier of fact might ultimately decide that Defendants' termination of Plaintiff's benefits was wrongful, there is no question that the billing codes Defendants obtained from the government and from Plaintiff himself evidenced that Plaintiff continued to perform at least some of his pre-disability duties after the onset of his disability. Plaintiff's post-disability billing codes, combined with his admission of Medicare fraud and the other information available to Defendants, create a *bona fide* dispute regarding whether Plaintiff is Totally Disabled or only Residually Disabled under the Policy. *See Citizens First Nat'l Bank of Princeton,* 200 F.3d at 1110 (determining that the insurer's denial of the plaintiff's benefits did not warrant § 155 sanctions even though the insurer changed defense strategies after obtaining complete information); *Rozenfeld v. Medical Protective Co.,* 73 F.3d 154, 158 (7th Cir. 1996) (affirming denial of § 155 sanctions where the insurer's position regarding the denial of the plaintiff's benefits was "at least arguable"); *Shrader v. Paul Revere Life Ins. Co.,* 833 F. Supp. 2d 877, 881-82 (N.D. Ill. 2011) (granting summary judgment to the insurer on the plaintiff's vexatious and unreasonable claim where the facts known to the insurer suggested that the plaintiff was capable of performing her job in part for years following the accident that caused her injuries).

Plaintiff lastly argues that the fact he pled guilty to one count of Medicare fraud did not warrant reevaluation of his disability status because the fraud to which he admitted guilt ended in 2001. Because the fraud occurred more than a year before Plaintiff's disability began, Plaintiff

argues that it could not have impacted the key determinations related to his disability claim, *i.e.,* determining the substantial and material duties of his occupation at the time of his disability and calculating his loss of income due to disability.  Plaintiff, however, takes too narrow a view of the ramifications of his Medicare fraud.  Even if the fraud did not continue into 2002 and beyond, Plaintiff's admitted fraud undermined the accuracy of the information Plaintiff had provided to Provident Life in support of his claim.  In light of Plaintiff's admission of Medicare fraud, it was not unreasonable or vexatious for Provident Life to question the veracity of Plaintiff's representations regarding his work activities and the reliability of the documents Plaintiff had submitted, especially considering Plaintiff's previous reticence in disclosing relevant information to Defendants.

Provident Life, moreover, did not terminate Plaintiff's benefits based merely on allegations of wrongdoing.  Even after the government indicted Plaintiff for Medicare fraud, Provident Life continued to pay disability benefits to Plaintiff for several years.  Provident Life did not terminate Plaintiff's benefits until after Plaintiff admitted to engaging in a scheme to defraud Medicare, which undermined his credibility and called into question the truthfulness of Plaintiff's previous disclosures.  For these reasons, the Court rejects Plaintiff's argument that Defendants acted vexatiously and unreasonably by purportedly misrepresenting his pre-disability occupation and post-disability work activities in order to justify reevaluating his claim under the Residual Disability provisions of the Policy.

**B.      Defendants' Determination Regarding Plaintiff's Ability to Drive**

Second, Plaintiff argues that Defendants acted vexatiously and unreasonably by "making unsupported coverage decisions surrounding [Plaintiff's] ability to drive" even though Defendants knew that Plaintiff could not legally drive because of his disability.  (*See* Pl. Mem. at

22.)  Provident Life, however, did not base its determination that it should administer Plaintiff's claim under the Residual Disability provisions on Plaintiff's ability to drive, albeit illegally.  To the contrary, even in reevaluating Plaintiff's claim, Provident Life continued to assume that Plaintiff could not drive to nursing homes or hospitals to visit patients.  Provident Life simply questioned whether his inability to travel to nursing homes and hospitals to care for patients prevented him from performing the substantial and material duties of his occupation.  The court acknowledges that Defendants' letter terminating Plaintiff's benefits referred to instances in which Plaintiff drove illegally, but the letter also reaffirmed that Plaintiff's claim file continued to support Plaintiff's inability to drive.  (*See* Termination Ltr. at 6.)  The letter referred to Plaintiff's driving activities as an example of misrepresentations Plaintiff made about his post-disability activities, not as a basis for finding that Plaintiff could still perform the substantial and material duties of his job.  (*See id.*)

C.     **Defendants' Alleged Attempts to Influence the Independent Medical Examiner**

Third, Plaintiff argues that Defendants acted vexatiously and unreasonably by attempting to influence the disability determinations of the doctor who performed an independent medical examination of Plaintiff in 2011.  (*See* Pl. Mem. at 24.)  Plaintiff argues that this conduct violated the Regulatory Settlement Agreement ("RSA") Defendants entered into with state insurance regulators in November 2004.  Defendants have moved to strike the RSA and Plaintiff's arguments and other exhibits related to it.  (*See* R. 115, Mot. to Strike at 2-5.)  Accordingly, the Court will address Defendants' motion to strike before evaluating Plaintiff's argument.

Defendants argue that the Court should strike the RSA and related exhibits and arguments on both relevancy and hearsay grounds.  First, Defendants argue that the RSA, which

Defendants entered in 2004, is irrelevant to determining whether Defendants acted vexatiously and unreasonably in terminating Plaintiff's benefits in 2011. The Court agrees. Although the RSA and related exhibits may have raised concerns about Defendants' practices prior to November 2004, they do not provide evidence of wrongs Defendants committed in reviewing Plaintiff's claim in 2010 and 2011. *See, e.g., Cagle v. Unum Life Ins. Co. of Am.,* No. 1:07-cv-157-SNLJ, 2009 WL 995544, *16 (E.D. Mo. Apr. 13, 2009); *Sivalignam v. Unum Life Ins. Co. of Am.,* 2011 WL 1584055, at *3-4 (E.D. Pa. 2011) ("[T]he practices that prompted the [RSA] and the Langbein article ended by 2004, a number of years before Unum's 2008-2009 investigation and resolution of [the plaintiff's] claim."); *Ain v. Unum Life Ins. Co. of Am.,* No. 08-cv-00540-WYD-BNB, 2009 WL 5126536, at *2 (D. Colo. Dec. 18, 2009) (finding that the RSA was not relevant to the plaintiff's claim because "it is undisputed that the claims handling practices identified in these state investigations occurred well before Defendant's decision to investigate Plaintiff's claim . . . ."). Defendants, moreover, implemented a corrective action plan as part of the RSA, and subsequent examinations by state regulators showed that Defendants had satisfied the RSA's requirements by 2008. (*See* R. 116 at Ex. A, Report of the Multistate Market Conduct Examination as of December 31, 2007); *see also Ain,* 2009 WL 5126536, at *2. The Court, therefore, grants Defendants' motion to strike the RSA and related exhibits and arguments on relevancy grounds.[12]

The Court, however, will consider Plaintiff's argument that Defendants acted vexatiously and unreasonably by attempting to influence the independent medical examiner, Dr. Coalter, without regard to whether the alleged conduct violated the RSA. Plaintiff argues that Provident Life repeatedly disregarded the conclusions of Dr. Coalter by asking him to reevaluate his

---

[12] Because the Court finds that the challenged exhibits are irrelevant, it does not need to rule on Defendants' hearsay objection.

determinations based on Plaintiff's post-disability activities. (*See* Pl. Mem. at 24.) Even viewed in the light most favorable to Plaintiff, however, the evidence does not support Plaintiff's characterization of the facts. After reviewing Dr. Coalter's findings, Provident Life submitted a total of four questions to Dr. Coalter asking him to specifically address Plaintiff's ability to read and use the computer with or without accommodations. (*See* Pl. L.R. 56.1 Stmt. of Add'l Fact ¶¶ 71-75.) These questions are the only evidence Plaintiff offers to support its argument that Provident Life improperly attempted to influence Dr. Coalter's conclusions. Provident Life's follow-up questions evidence an attempt to reconcile Dr. Coalter's findings about Plaintiff's capabilities with Plaintiff's known post-disability activities. The questions, however, do not evidence an attempt to influence Dr. Coalter improperly into changing his findings. The Court, therefore, rejects Plaintiff's contention that Provident Life's correspondence with Dr. Coalter provides evidence of bad faith.

### D. Defendants' Surveillance of Plaintiff

Fourth, Plaintiff argues that Defendants acted vexatiously and unreasonably by conducting harassing surveillance of him near his home and in public. (*See* Pl. Mem. at 23.) The plain language of § 155 provides that its penalties apply only when an insurer acts vexatiously and unreasonably in denying liability on a policy, disputing the amount of loss payable, or delaying the settlement of a claim, *see* 215 ILCS 5/155(1), and "[b]ecause [§ 155] is penal in nature its provisions must be strictly construed." *See Phillips v. Prudential Ins. Co. of Am.,* 714 F.3d 1017, 1023 (7th Cir. 2013) (quoting *Citizens First Nat'l Bank of Princeton,* 200 F.3d at 1110). The statute makes no mention of imposing penalties on an insurer for conducting surveillance or similar claims handling issues, and Plaintiff cites no authority in support of his argument that Defendants' allegedly harassing surveillance warrants penalties under § 155.

Additionally, Plaintiff offers no evidence that Defendants conducted their surveillance in bad faith. Plaintiff never complained to Defendants that their surveillance was harassing, and there is no evidence that Defendants intended to harass Plaintiff through their investigation. Rather, the evidence—even when viewed in the light most favorable to Plaintiff—shows that Defendants conducted surveillance in order to investigate the accuracy of Plaintiff's representations about his post-disability activities. The Court, therefore, rejects Plaintiff's argument for imposing penalties on Defendants because of their allegedly harassing surveillance of him.

**E.      Defendants' Alleged Discrimination Against Plaintiff**

Fifth, Plaintiff argues that Defendants' discriminated against him in terminating his benefits based on his religion and national origin. (*See* Pl. Mem. at 23.) Plaintiff's argument is wholly without merit. Plaintiff cites instances in which Provident Life's investigators described Plaintiff's friends as foreign-looking, Pakistani, or Middle-eastern and described his wife and others as wearing Middle-Eastern apparel. (*See id.* at 23.) There is no evidence that the investigators used these terms pejoratively, rather than as physical identifiers used to describe the individuals they observed.

Plaintiff also cites an article from a website titled *Militant Islam Monitor* that was in his claim file as evidence that Defendants discriminated against him. (*See id.* at 23-24.) Provident Life denies that it relied on the article in terminating Plaintiff's benefits, and Plaintiff offers no evidence to dispute Provident Life's denial. The undisputed evidence shows that the article turned up as the result of an Internet search using the terms "Asif," "Choudhry,"[13] and "Medicare," and Provident Life's practice is to include all documents reviewed during the claim

---

[13] Asif Choudhry is Plaintiff's brother.

review process in the insured's claim file, regardless of whether it relied on the document in making coverage determinations. Provident Life, moreover, placed the article in Plaintiff's file in November 2006 and yet continued to pay Total Disability benefits to Plaintiff until August 2011. There is no evidence whatsoever linking the article to Provident Life's termination of Plaintiff's benefits.

**F.     Totality of the Circumstances**

None of Plaintiff's arguments—considered separately or collectively—establish a genuine issue of fact regarding whether Defendants acted vexatiously and unreasonably in terminating Plaintiff's disability benefits. To the contrary, the evidence, even viewed in the light most favorable to Plaintiff, shows that a *bona fide* dispute existed regarding whether Plaintiff was Totally Disabled or only Residually Disabled and, in the latter case, whether Plaintiff had provided truthful and accurate information that would allow Defendants to calculate his loss of monthly income due to disability. Sanctions under § 155 are therefore inappropriate. *See, e.g., Citizens First Nat'l Bank of Princeton,* 200 F.3d at 1110; *Rozenfeld,* 73 F.3d at 158; *Shrader,* 833 F. Supp. 2d at 881-82; *see also TKK USA, Inc.,* 7272 F.3d at 795 ("[I]nsurers are entitled to defend reasonable positions in litigation without [incurring] additional cost under section 155."). The Court, therefore, grants summary judgment to Defendants on Plaintiff's claim for unreasonable and vexatious conduct.

**III.     Declaratory Relief**

**A.     Waiver and Estoppel**

In Counts IV and V of the Second Amended Complaint, Plaintiff seeks declaratory relief stating that Defendants have waived and are estopped from asserting a defense of mistake as to their initial determination that Plaintiff is Totally Disabled. Waiver and estoppel have similar

effects in the insurance context; both prevent an insurer from belatedly asserting policy defenses. Waiver, however, "focuses exclusively on the conduct of the insurer, while estoppel focuses on the conduct of the insured in response to representations made by the insurer." *See Lumbermen's Mut. Cas. Co. v. Sykes,* 384 Ill. App. 3d 207, 218, 322 Ill. Dec. 167, 890 N.E.2d 1086 (Ill. App. Ct. 2008).

### 1.     Waiver

"Waiver is an equitable principal that is invoked to further the interests of justice where a party either relinquishes a known right or acts in such a manner that would warrant an inference of such relinquishment." *Rosalind Franklin Univ. of Med. & Sci.,* 2014 IL App (1st) 113755 ¶ 99, 380 Ill. Dec. 89, 8 N.E.3d 20; *Essex Ins. Co. v. Stage 2, Inc.,* 14 F.3d 1178, 1181 (7th Cir. 1994). "Waiver may be either express or implied, arising from acts, words, conduct, or knowledge of the insurer." *Essex, Ins.,* 14 F.3d at 1181. As a general rule, "a party will not be found to have waived rights of which it is ignorant." *See Lumbermen's Mut. Cas. Co.,* 384 Ill. App. 3d at 223, 322 Ill. Dec. 167, 890 N.E.2d 1086 (citing *American States Ins. Co. v. National Cycle, Inc.,* 260 Ill. App. 3d 299, 307, 197 Ill. Dec. 833, 631 N.E.2d 1292 (Ill. App. Ct. 1994)). An insurer may waive a policy defense, however, "by continuing under a policy when it knows, or in the exercise of ordinary diligence, could have known the facts in question giving rise to the defense." *Id.*; *see also Thompson v. Green Garden Mut. Ins. Co.,* 261 Ill. App. 3d 286, 290, 199 Ill. Dec. 336, 633 N.E.2d 1327 (Ill. App. Ct. 1994) ("If the insurance company is fully advised of the facts bearing on its policy defense and does not then insist on noncoverage but recognizes the continued validity of the policy by requiring the insured to go to the trouble and expense, if any, of preparing proofs of loss and related matter, an intention to waive the policy defense would follow." (citation omitted)). For waiver to occur, a party's words or conduct must be

"inconsistent with any intention other than to waive it." *Lumbermen's Mut. Cas. Co.,* 384 Ill. App. 3d at 219, 322 Ill. Dec. 167, 890 N.E.2d 1086.

Plaintiff argues that Defendants waived their right to reevaluate his disability claim under the Residual Disability provisions in April 2007 when Provident Life removed its reservation of rights regarding Plaintiff's benefits and in 2009 when Provident Life continued paying Total Disability benefits after again reevaluating Plaintiff's disability claim. The Court addresses each argument in turn.

### a.      Waiver in 2007

In 2006, after Provident Life learned of the part-time psychiatric work Plaintiff had performed at his brother's practice from December 2005 to June 2006, Provident Life reevaluated Plaintiff's eligibility for Total Disability benefits during that time period. As part of its reevaluation, Provident Life compared Plaintiff's pre-disability billing codes with the billing codes Plaintiff used while working at his brother's practice in 2005-2006. Defendants also requested that Plaintiff provide additional information regarding his current and pre-disability income in case Provident Life determined that Plaintiff was Residually Disabled rather than Totally Disabled. On April 24, 2007, Provident Life informed Plaintiff that based upon its updated evaluation of his disability claim, it was removing its reservation of rights on Plaintiff's benefit payments. (*See* Defs. L.R. 56.1 Stmt. ¶ 35; *see also* PLA-CL-NL4197253-001320.)

Plaintiff contends that by removing the reservation of rights after reevaluating Plaintiff's disability claim, Provident Life waived its ability to argue later that it should have administered Plaintiff's claim under the Residual Disability provisions. Defendants, on the other hand, argue that Plaintiff's waiver claim fails because Provident Life based its reevaluation of Plaintiff's disability status on new information it received after it removed its reservation of rights.

The Court agrees with Plaintiff in part. Provident Life's April 24, 2007 letter removing its reservation of rights evidenced a voluntary relinquishment of Provident Life's right to reevaluate Plaintiff's disability claim as one for Residual Disability benefits based on the information already known to Provident Life at the time. The letter however, did not relinquish Provident Life's ability to reevaluate Plaintiff's claim in the event Defendants obtained additional information about Plaintiff's pre- and post-disability work activities and income.

Provident Life specifically stated in its December 2006 letter that it still would periodically request updated information from Plaintiff and his doctors and would monitor the status of the indictment for Medicare fraud pending against Plaintiff. (*Id.* at PLA-CL-NL4197253-00862.) Furthermore, in its April 2007 letter, Provident Life stated that although it was ceasing its efforts to pursue Plaintiff's federal income tax returns, it reserved the right to request, obtain, and review Plaintiff's tax returns in the event that circumstances warranted further review of his pre-disability earnings.[14] (*Id.* at PLA-CL-NL4197253-001321.) This statements, combined with Provident Life's previous communications with Plaintiff regarding the status of his indictment, is not consistent with "the intentional relinquishment of a known right." *See Essex Ins. Co.,* 14 F.3d at 1181 (no waiver where the insurer's actions failed to demonstrate an intent to provide coverage in spite of policy exclusions); *Lumbermen's Mut. Cas. Co.,* 384 Ill. App. 3d at 221-22, 322 Ill. Dec. 167, 890 N.E.2d 1086 (finding that the insurer had waived its noncoverage defense with respect to one portion of the insured's damages but not with respect to other portions); *Chatham Corp. v. Dann Ins.,* 351 Ill. App. 3d 353, 285 Ill. Dec. 663, 812 N.E.2d 483 (Ill. App. Ct. 2004) (finding no waiver where the insurer repeatedly

---

[14] One circumstance that would warrant further review of Plaintiff's pre-disability earnings is if Provident Life began administering Plaintiff's disability claim under the Residual Disability provisions. (*See* Policy at 9-10.)

questioned the insured's coverage for certain expenses even though it conceded coverage for other expenses). Accordingly, although Provident Life waived its ability to reevaluate Plaintiff's disability claim under the Residual Disability provisions based on the information known to Provident Life by April 24, 2007, Provident Life did not relinquish its right to reexamine Plaintiff's claim based on new information it obtained after April 2007.

Provident Life argues that the following information it obtained after April 2007 justified the termination of Plaintiff's benefits: (1) Plaintiff's plea of guilty to Medicare fraud, which Provident Life contends indicated that the billing codes on which Provident Life had previously relied in evaluating Plaintiff's disability claim were inaccurate and inflated; (2) additional billing codes Provident Life obtained from the federal government, which revealed that Plaintiff had performed more post-disability work than he had previously disclosed; and (3) Plaintiff's potentially inflated pre-disability earnings based on his alleged overbilling and "up coding." (*See* Defs. Mem. at 18.) Plaintiff argues that the additional information on which Provident Life relies to justify its reexamination of his disability claim did not differ materially from the information previously available to Provident Life. (*See* Pl. Resp. Br. at 15-16; *id.* at 17.) As explained above, however, genuine issues exist regarding whether the information Provident Life received after April 2007 justified reevaluating Plaintiff's disability claim under the Residual Disability provisions. Granting summary judgment to either party on Plaintiff's waiver claim is, therefore, inappropriate.[15]

---

[15] In support of their motion for summary judgment on Plaintiff's waiver claim, Defendants rely on the billing codes Provident Life obtained from the government to prove Plaintiff's post-disability work activities. In doing so, Defendants offer the billing codes as evidence of the codes Plaintiff actually used in 2004-2006—not just as evidence of the billing codes Provident Life obtained from the government— and for the truth of the matter—not just to prove Provident Life's state of mind. At this time, the Court need not determine whether the billing codes are admissible for these purposes, however, because genuine disputes of fact exist regardless of their admissibility.

### b. Waiver in 2009

Plaintiff argues that Defendants also waived their ability to administer Plaintiff's disability benefits under the Residual Disability provisions in 2009 after Provident Life conducted another review of Plaintiff's disability claim but then continued to administer his claim under the Total Disability provisions. (*See* Pl. Resp. Br. at 15-16.) Plaintiff relies primarily on Provident Life's statement that "[a]lthough the insured is involved in ongoing legal battles, it appears reasonable that the insured continues to satisfy his policy's terms of Total Disability, given the 11/20/09 clinical consultation and 1/2/09 VRC review." (*Id.* at 15.) According to Plaintiff, this statement and Provident Life's continued administration of his claim under the Total Disability provisions show that Defendants waived their ability to reevaluate Plaintiff's disability claim based on the outcome of his criminal case.

Plaintiff's argument is unavailing. Provident Life's reference to Plaintiff's "ongoing legal battles" does not evidence that it voluntarily relinquished its right to reevaluate Plaintiff's coverage if he was convicted of Medicare fraud. To the contrary, Provident Life's correspondence with Plaintiff informed Plaintiff that it would continue to monitor the status of Plaintiff's indictment and shows that Provident Life reserved its ability to reassess Plaintiff's disability claim if he was convicted of the charges against him. Furthermore, as explained above, Provident Life's evaluation of Plaintiff's disability status in 2009, which Provident Life based on the information available to it at the time, did not necessarily waive Provident Life's ability to reassess Plaintiff's claim if it later learned that Plaintiff had provided misleading information regarding his pre- and post-disability work activities and income.

## 2. Estoppel

Estoppel occurs where an insurer's representations or conduct misleads the insured to the insured's detriment.  *See Essex Ins. Co.,* 14 F.3d at 1182.  For a plaintiff to establish estoppel in the insurance context, the plaintiff must prove the following: "(1) that he was misled by the acts or statements of the insurer or its agent; (2) reliance by the insured on those representations; (3) that such reliance was reasonable; and (4) detriment or prejudice suffered by the insured based on the reliance."  *Lumbermen's Mut. Cas. Co.,* 384 Ill. App. 3d at 224, 322 Ill. Dec. 167, 890 N.E.2d 1086.

A genuine issue exists regarding the reasonableness of Plaintiff's purported reliance on Provident Life's removal of the reservation of rights.  It is well-established that "a party claiming the benefit of an estoppel cannot shut his eyes to obvious facts . . . and then charge his ignorance to others."  *See R& B Kapital Dev., LLC v. North Shore Comm'ty Bank & Tr. Co.,* 358 Ill. App. 3d 912, 922, 295 Ill. Dec. 95, 832 N.E.2d 246 (Ill. App. Ct. 2005) (collecting cases); *Bank of N.Y. v. Langman,* 2013 IL App (2d) 120609 ¶ 26, 369 Ill. Dec. 436, 986 N.E.2d 749 (Ill. App. Ct. 2013).  To benefit from equitable estoppel, the party asserting it must "have had no knowledge or means of knowing the true facts."  *See R & B Kapital Dev.,* 358 Ill. App. 3d at 922, 295 Ill. Dec. 95, 832 N.E.2d 246 (internal quotation marks omitted).  A genuine issue exists here regarding whether the new information Provident Life received after April 2007 warranted reevaluating Plaintiff's disability claim under the Policy's Residual Disability provisions.  The evidence the parties have presented would allow a trier of fact to reasonably draw either inference.  A genuine issue, therefore, exists regarding the whether Plaintiff's purported reliance on Provident Life's removal of its reservation of rights, which occurred before Provident Life received the additional information regarding Plaintiff's claim, was reasonable.

Viewing the evidence in the light most favorable to Plaintiff, a genuine issue for trial also exists regarding the remaining elements of Plaintiff's estoppel claim.  Plaintiff offers evidence that he relied on Provident Life's April 2007 determination to continue administering his claim under the Total Disability provisions to his detriment by, among other things, not seeking other employment or other sources of income.  (*See* R. 106-8, Pl. Aff. ¶ 10.)  Provident Life argues that Plaintiff did not suffer any detriment because he spent the income that he had defending the criminal charges pending against him and he never sought training or education to pursue a new career.  (*See* Defs. Reply Br. at 14-15.)  How Plaintiff spent his income, however, is irrelevant to whether he detrimentally relied on Provident Life's removal of its reservation of rights in deciding not to pursue other sources of income.  Plaintiff's failure to pursue training and educational opportunities, moreover, supports, rather than refutes, Plaintiff's sworn statement that he passed up opportunities to pursue additional sources of income because of his expectation that he would continue to receive Total Disability benefits under the Policy.

It is undisputed that Plaintiff's condition did not significantly improve from 2003 to 2011.  Although Plaintiff understood that Provident Life's removal of its reservation of rights did not guarantee that he would indefinitely receive Total Disability benefits, viewing the evidence in the light most favorable to Plaintiff, it may have been reasonable for him to expect that he would continue to receive Total Disability benefits unless his condition (or available assistive technology) improved.  In sum, genuine disputes preclude the Court from granting summary judgment to either party on Plaintiff's estoppel claim.

## B.      Declaration of Future Coverage

In Count II of the Second Amended Complaint, Plaintiff seeks declaratory relief stating that he is entitled to all future benefits under the policy.  (*See* Second Am. Compl. at 14.)  An

insured's entitlement to disability benefits in the future depends upon the fulfillment of certain conditions precedent—"*i.e.,* whether he meets the terms and conditions for coverage in the future." *See Shyman v. Unum Life Ins. Co. of Am.,* No. 01 C 7366, 2002 WL 31133244, at *1 (N.D. Ill. Sept. 20, 2002). As a result, the Seventh Circuit has held that an order stating that a plaintiff is entitled to receive future benefits is inappropriate "unless there [is] complete repudiation or renunciation of the contract." *See Morgan v. Aetna Life Ins. Co.,* 157 F.2d 527, 530 (7th Cir. 1946); *Trainor v. Mutual Life Ins. Co. of N.Y.,* 131 F.2d 895, 897 (7th Cir. 1942); *see also Kaplan v. Standard Ins. Co.,* No. 11 C 6487, 2103 WL 5433463, at *3 (N.D. Ill. Sept. 30, 2013) ("Seventh Circuit precedent also generally bars courts from declaring a claimant's eligibility for benefits in the future."); *Menotti v. Metropolitan Life Ins. Co.,* No. 08 C 2767, 2009 WL 1064605, at *3 (N.D. Ill. Apr. 20, 2009) ("[W]here an insured seeks to recover future disability benefits that depend upon certain conditions precedent, future payments cannot be enforced until due."); *Shyman,* 2002 WL 31133244, at *1 ("Whether Shyman will be entitled to disability benefits in the future depends on certain conditions precedent . . . . [a]nd as the Seventh Circuit held in *Morgan*, such conditional payments cannot be enforced until due.").

Plaintiff does not argue that Provident Life repudiated or renounced the Policy, and he does not even attempt to distinguish *Morgan* and *Trainor* on factual or legal grounds. (*See* Pl. Resp. Br. at 23.) Indeed, Plaintiff provides no legal authority that supports his argument that the Court can enter an order declaring his entitlement to future benefits under the Policy. (*See id.*) Plaintiff, therefore, has waived the issue. *See, e.g., Hach Co. v. Hakuto, Co., Ltd.,* 784 F. Supp. 2d 977, 987-88 (N.D. Ill. 2011) ("Conclusory, skeletal, or perfunctory briefing will result in waiver of the issue, as the Seventh Circuit has repeatedly held."). As a result, the Court grants

Provident Life's summary judgment motion and denies Plaintiff's summary judgment motion with respect to Count II.

## IV. Summary Judgment for Defendant Unum Group

Defendants argue that even if the Court does not grant summary judgment to Provident Life, it should award summary judgment to Unum Group because Unum Group is not a party to the Policy. (*See* Defs. Mem. at 24.) It is well-established under Illinois law that contracts generally do not bind nonparties. *See, e.g., Carter v. SSC Odin Operating Co., LLC,* 2012 IL 113204 ¶¶ 55-56, 364 Ill. Dec. 66, 976 N.E.2d 344 (Ill. 2012); *Chicago College of Osteopathic Med. v. George A. Fuller, Co.,* 719 F.2d 1335, 1345 (7th Cir. 1983) ("It is clear on the face of the contract that Peoples Bank is not a party to that contrary, and therefore, could not be bound by it."); *Swiss Reinsurance Am. Corp. v. Access Gen. Agency, Inc.,* 571 F. Supp. 2d 882, 885 (N.D. Ill. 2008) ("[N]onparties to a contract are not liable for its breach."). Plaintiff contends, however, that although Unum Group is not a party to the Policy, it is a proper defendant because it acted with apparent authority from Provident Life in administering Plaintiff's claim. (*See* Pl. Resp. Br. at 25.)

To prove apparent authority under Illinois law, a litigant must show that "(1) the principal . . . knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and the agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority." *Graver v. Pinecrest Volunteer Fire Dep't,* 2014 IL App (1st) 123006 ¶ 17, 379 Ill. Dec. 174, 6 N.E.3d 251 (Ill. App. Ct. 2014) (quoting *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.,* 326 Ill. App. 3d 126, 137, 259 Ill. Dec. 694, 759 N.E.2d 174 (Ill. App. Ct. 2001)). Plaintiff cites no legal authority in support of his apparent authority argument, and he does not

even attempt to establish the elements for proving apparent authority under Illinois law. Plaintiff, therefore, has waived his apparent authority argument. *See, e.g., Hach Co.,* 784 F. Supp. 2d at 987-88. As a result, the Court grants summary judgment to Unum Group and dismisses Plaintiff's claims against Unum Group with prejudice. *See Northbound Group, Inc. v. Norvax, Inc.,* --- F. Supp. 2d ----, 2013 WL 6987185, at*10-11 (N.D. Ill. Dec. 3, 2013) (granting summary judgment to the parent company of the contracting party because the plaintiff failed to provide "any legal or factual basis to support its claim that [the defendant] breached [the] contract to which it was never a party").

## CONCLUSION

For the reasons explained above, the Court grants in part and denies as moot in part Defendants' motion to strike, denies Plaintiff's motion for summary judgment, and grants in part and denies in part Defendants' motion for summary judgment. The Court enters summary judgment in favor of Defendant Unum Group on all counts and in favor of Defendant Provident Life on Counts II and III of the Second Amended Complaint.


Date:  July 16, 2014                                        ENTERED

                                                            _____
                                                            AMY J. ST. EVE
                                                            U.S. District Court Judge