**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NASEEM M. CHAUDHRY, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-5838 |
| | ) | |
| PROVIDENT LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Naseem Chaudhry, M.D. has moved to exclude testimony from Dr. Carolyn R. Carman, offered by Provident Life and Accident Insurance Company ("Provident Life" or "Defendant"), pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). For the reasons discussed below, the Court denies without prejudice Plaintiff's motion.

## BACKGROUND

Plaintiff Naseem M. Chaudhry, M.D., suffers from a deteriorative eye condition, which has impaired his ability to drive and treat his psychiatric patients. Defendant Provident Life paid total disability benefits to Plaintiff under a disability insurance policy from mid-2003 to August 2011. After Provident Life terminated Plaintiff's disability benefits on August 15, 2011, Plaintiff sued Provident Life and its parent company, Unum Group ("Unum"), alleging breach of contract, waiver, and estoppel arising from the termination of Plaintiff's disability benefits. (*See* R.78,

Second Am. Compl.; *see also* R.132, Opinion granting-in-part Defs.' Motion for Summary Judgment.)[1]

Defendant disclosed Dr. Carolyn R. Carman O.D as an expert regarding Dr. Chaudhry's visual condition and function of work capacity. (R.145-2; *see also* R.157-1.) Dr. Carman is Board Certified by the American Board of Optometry and has practiced for over 30 years. (R.157-1, at 1.) Dr. Carman is Director of Center for Sight Enhancement, a clinical professor at the University Eye Institute at the University of Houston, and currently serves as a member of the Texas Department of Health Medical Advisory Board which includes providing medical opinions and recommendations to the Texas Department of Public Safety regarding medical and visual limitations related to driver's license candidates. (*Id.*) Dr. Carman offers a single opinion in her expert report related to this case: "Dr. Chaudhry's visual impairment was functionally mild and did not prevent him from performing the material and substantial duties of his vocation as a psychiatrist or geriatric psychiatrist during the time frame of the records review." (*Id.*, at 12.)

## LEGAL STANDARD FOR *DAUBERT* MOTIONS

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Corp.*,

---

[1] On July 16, 2014, the Court granted summary judgment as to Unum—a nonparty to the disputed contract—and dismissed all of Plaintiff's claims against Unum with prejudice (*See* R.132, at 46-47.) Reference to "Defendant" in this ruling, therefore refers only to Provident Life. The Court also granted summary judgment as to Provident Life on Plaintiff's claim for unreasonable and vexatious conduct and declaration of future coverage. (*See id.*, at 37, 45-46.)

561 F.3d 698, 705 (7th Cir. 2009). Rule 702, governing the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted "is not only relevant, but reliable." *Manpower, Inc. v. Ins. Co. of Pa.* 732 F.3d 796, 806 (7th Cir. 2013) *(citing Daubert,* 509 U.S. at 589, 113 S.Ct. 2786); *see also Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013) (explaining the current version of Rule 702 essentially codified *Daubert* and "remains the gold standard for evaluating the reliability of expert testimony"). The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *See Manpower, Inc.*, 732 F.3d at 806 (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

Under the expert-testimony framework, courts perform the gatekeeping function of determining whether the expert testimony is both relevant and reliable prior to its admission at trial. *See Manpower, Inc.*, 732 F.3d at 806; *Lees*, 714 F.3d at 521; *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting

3

expert testimony: first, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees*, 714 F.3d at 521-22; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *Pansier*, 576 F.3d at 737. A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (citing *Daubert,* 509 U.S. at 596). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id*.

In addition, as the Seventh Circuit teaches:

> Where the gatekeeper and the factfinder are one and the same – that is, the judge – the need to make such decisions prior to hearing testimony is lessened. *See United States v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005). That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (observing that "the court in a bench trial need not make reliability determinations before evidence is presented" because "the usual concerns of the rule— keeping unreliable expert testimony from the jury—are not present in such a setting"); *Brown*,

415 F.3d at 1269 ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself").

## ANALYSIS

Plaintiff seeks to exclude all testimony of Dr. Carolyn R. Carman. As an initial matter, Plaintiff does not challenge Dr. Carman's qualifications. (R.145-1, at 4 ("Here, given Dr. Carman's[] background, she would likely be qualified as an expert in the field of Optometry").) Plaintiff does, however, question the reliability of Dr. Carman's testimony and asserts that she ignored substantial documentation and cherry picked facts to support her conclusions. In doing so, Plaintiff argues, Dr. Carman arrives at conclusions contrary to Provident Life's previous position regarding Plaintiff's disability without providing an explanation for the disparity.

Dr. Carman's expert report indicates that in forming her opinion she reviewed Plaintiff's medical records and statements from Plaintiff's providers and Dr. Coalter—all of which contained clinical testing relating to Plaintiff's visual acuity; deposition transcripts of Plaintiff, his treating physicians, wife, brothers, and friend; Plaintiff's statements to Provident Life; evidence related to Plaintiff's work as a psychiatrist; Plaintiff medical and driver's license application information; news articles; requirements for an Illinois driver's license, and Plaintiff's Second Amended Complaint. (R.157, at 7-8; R.157-1, at 1.) Plaintiff alleges, however, that Dr. Carman ignored substantial evidence. Namely, Plaintiff claims that Dr. Carman ignored: (1) Dr. Coalter's Independent Medical Exam (R.145-1, at 5-6, 8-10); (2) visual function testing recommendations and attempts (*id.*, at 6-7); and (3) the Policy's definition of "Total Disability" (*id.*, at 10-12). The Court addresses each below.

**I.     Dr. Carman Did Not Ignore Dr. Coalter's Independent Medical Exam**

Plaintiff alleges that Dr. Carman ignored facts that she reviewed, rendering her analysis unscientific. In particular, Plaintiff claims that Dr. Carman ignored Dr. Coalter's conclusion from his Independent Medical Examination of the Plaintiff "that Plaintiff's visual acuity was not stable, and instead fluctuated in and out of legal blindness." (R.145-1, at 5.) The listing of documents Dr. Carman considered in forming her opinion in this case includes "Records of Spectrios Institute for Low Vision at Deicke House" and her report specifically provides a summary of a February 22, 2011 report entitled "Spectrios Institute at Deicke House, John Colater, O.D. Report." (*See* R.157-1, at 1, 6.) In the "Discussion" section of Dr. Carman's expert report, she further discusses Dr. Coalter's February 22, 2011 report and addresses Dr. Coalter's additional reports from February 26, 2011; March 16, 2011; and April 1, 2011. (*See id.*, at 9-11.)

Ultimately, Plaintiff's argument simply takes issue with the fact that Dr. Carman did not arrive at the same conclusion as Dr. Coalter—that Plaintiff was Totally Disabled—which is not an appropriate basis for a *Daubert* challenge. *See Manpower Inc.*, 732 F.3d at 806 (citations omitted) ("Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produced"). Plaintiff alleges that Dr. Carman disregarded Dr. Coalter's conclusion and ignored 99% of what Dr. Coalter stated, namely that Dr. Coalter could not give a recommendation without Plaintiff participating in a rehabilitative assessment program. (R.145-1, at 9; R.165, at 1-4.) Plaintiff has failed to identify any evidence, however, that Dr. Carman ignored relevant evidence that is contrary to her views. Putting aside the fact that Dr. Carman spends almost two full pages of a thirteen page report discussing Dr. Coalter's findings, Dr. Carman's expert report

provides a basis for her disagreement with Dr. Coalter. Dr. Carman, for example, notes that Dr. Coalter's corrected distance visual acuity was only an estimate—he did not base it on the actual measurements. (R.157-1, at 9-10.) She further notes that he did not record near visual acuity measurements and opines that Dr. Coalter's determination that Plaintiff could not legally drive was based on an inaccurate assessment of the Illinois driving requirements and on a single test result from a partially subjective visual field test that warrants repeated performance for reliability. (*See id.*, at 9-11.) These findings—subject to cross-examination for their accuracy—provide a basis for Dr. Carman's disagreement with Dr. Coalter's conclusion and do not warrant the Court's exclusion of Dr. Carman's opinion as unreliable. These types of arguments are inappropriate for a *Daubert* motion as they go to the weight of Dr. Carman's testimony rather than its admissibility. *See Manpower, Inc.*, 732 F.3d at 806 (reliability is an assessment of the validity of methodology, not the quality of the data used in applying the methodology or the conclusions generated); *Metavante Corp.*, 619 F.3d at 762 (finding criticisms as to the quality of expert's testimony "do not go to the admissibility but to the appropriate weight that should be accorded to the evidence"). To the extent that Plaintiff disagrees with Dr. Carman's conclusions, he can address the issues through rigorous cross-examination at trial if he so chooses. *See Stollings*, 725 F.3d at 766; *Lapsley*, 689 F.3d at 805, 810-11, 817.

II. **Dr. Carman's Conclusions Regarding Assessment of Plaintiff's Vocational Limitations**

While Plaintiff does not directly dispute Dr. Carman's methodology, he does argue that Dr. Carman relied on inaccurate information and challenges her conclusion that "no entries were found in the medical records that stated Dr. Chaudhry was recommended to refrain from driving, working, or reading activities." (R.157-1, at 9; *see also id.*, ("There is no discussion of these options with Dr. Chaudhry in the record and no referral for evaluation of his visual function or

7

for consideration of low vision glasses, devices, or services"); *id*. ("There were no attempts to assess these functional visual activities or make a referral to do so which would be expected if someone was offering an opinion about disability and appropriate for any patient suffering a visual impairment impacting their work or activities of daily living").)

A challenge to the reliability of an expert opinion under *Daubert* "is primarily a question of the validity of the methodology employed by [the] expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc.*, 732 F.3d at 806. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* (citations omitted). As the Seventh Circuit has recognized, the distinction between conclusions and methodology "is not always an easy line to draw." *Id.* (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). The situation presented here approaches the line drawn between questioning the methodology and questioning the conclusion, making it difficult for the Court to determine—based on the record currently before it—the reliability of Dr. Carman's methodology.

Dr. Carman's methodology appears appropriate as her expert report indicates that she reviewed Plaintiff's medical records and statements from Plaintiff's providers and Dr. Coalter— all of which contained clinical testing relating to Plaintiff's visual acuity; deposition transcripts of Plaintiff, his treating physicians, wife, brothers, and friend; Plaintiff's statements to Provident Life; evidence related to Plaintiff's work as a psychiatrist; Plaintiff medical and driver's license application information; news articles; requirements for an Illinois driver's license, and Plaintiff's Second Amended Complaint. (*See* R.157, at 7-8; R.157-1, at 1.) Dr. Carman applied her undisputed expertise in the field of Optometry to her analysis of Plaintiff's medical and

8

occupational evidence, in addition to other medically and factually relevant documents, which generally follows an accepted methodology for a medical expert. *See Cooper*, 2014 WL 6852625, at *2 (finding an ophthalmology expert's opinion about the cause of the plaintiff's eye condition reliable because the expert reviewed the plaintiff's medical records, physical examination, and risk factors related to cause or contribution of the plaintiff's medical condition); *Rossi v. Groft*, No. 10 C 50240, 2013 WL 1446502, at *2-3 (N.D. Ill. Apr. 9, 2013) (finding a surgical expert's opinion diagnosing the plaintiff's medical condition reliable even though it did not mention a methodology explicitly, but was based on an accepted methodology for diagnosing medical conditions—reviewing medical records in light of his medical expertise); *Heard v. Illinois Dept. of Corrections*, No. 06 C 0644, 2012 WL 2524748, at *3 (N.D. Ill. June 29, 2012) (finding an anesthesiologist expert's opinion regarding diagnosis and treatment plans for pain management reliable because the expert reviewed the plaintiff's medical records and medical history, pleadings and deposition transcripts from the lawsuit, and medical journal articles related to the plaintiff's condition).

Plaintiff argues, however, that in executing this methodology, Dr. Carman did not apply her analysis to the facts of this case and ignored evidence that is contrary to her opinion. (R.145-1, at 4.) Namely, Plaintiff challenges Dr. Carman's opinion based on her conclusion that Plaintiff's medical reports are lacking in their discussions and evaluations relating to Plaintiff's vocational functional limitations. (*See* R.157-1, at 9.) Plaintiff argues that this conclusion is false because evidence exists that demonstrates Provident Life "did evaluate the possibility of assistive devices but rejected them as not portable for his occupation that required travel between nursing facilities." (*See* R.145-1, at 7.) In support of his argument, Plaintiff references two vocational assessments—conducted in 2003 and 2007—that address the functional limitations

9

caused by Plaintiff's vision impairments. (*See* R.145-1, at 7 (citing R.63-2, Ex. H, Dec. 8, 2003 Vocational Review; R.63-2, Ex. P, Provident Life Letter to Chaudhry).) Plaintiff appears to focus more on Dr. Carman's conclusion, rather than her methodology. Dr. Carman's criticism that Plaintiff's medical records lack analysis of vocational functional limitations is not expressed as a general conclusion in regard to all of the reviewed data. (R.157, at 9; R.157-1, at 9.) Instead, she expressed it in direct reference to reports from Dr. Gieser and Dr. Tabbutt at Wheaton Eye Clinic. (R.157-1, at 9.) Dr. Carman's expert report also indicates that she reviewed "[r]ecords of occupational analysis and vocational reviews by Provident Life," but her report does not reference the specific portions of the vocational assessments cited by Plaintiffs above. (*See id.*, at 1.) It is unclear from Dr. Carman's report whether she was unaware of the specific reports cited by Plaintiff or whether she ignored them or selectively chose to reference and rely on different medical reports based on her experience and expertise.

Although it is true that an expert is not permitted to simply ignore evidence that is contrary to her opinion in implementing an accepted methodology, in this case, the Provident Life vocational assessments are not contrary to Dr. Carman's opinion that the clinical findings do not support Plaintiff's inability to perform his occupation. *See e.g., Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F.Supp.2d 870, 889-90 (E.D. Wis. 2010) (finding expert's methodology unreliable because of the expert's unwarranted dismissal of the evidence that undermined his conclusion or outright blindness to contrary evidence). Instead, the findings in the Provident Life vocational assessments may challenge the accuracy or credibility of Dr. Carman's conclusions as opposed to the reliability of her opinions. *See Lapsley*, 689 F.3d at 805 (citing *Daubert,* 509 U.S. at 596) (explaining that a district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy"). Indeed, Plaintiff can

challenge the factual basis of Dr. Carman's opinion and her reliance on clinical evidence and testimony from certain doctors rather than statements from Provident Life on cross-examination, as these issues closely relate to the accuracy of her conclusion. *See Lapsley*, 689 F.3d at 805 (explaining that the accuracy of the actual evidence relied upon in a relevant and reliable expert opinion can be challenged with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence …'"); *see also Cooper v. Cassidy*, No. 12 C 5104, 2014 WL 6852625, at *2 (N.D. Ill. Dec. 4, 2014) (addressing defendant's attack on the factual basis of a medical expert's opinion relying on his own records of treatment and the patient's statements rather than actual clinical evidence as potential "fertile ground for cross-examination" as the issue "goes to the weight of the testimony, not its admissibility"); *Cage v. City of Chicago*, 979 F.Supp.2d 787, 824 (N.D. Ill. 2013) (finding expert testimony regarding nationally accepted practices in crime laboratories admissible despite the defendant's challenge to the methodology because it was allegedly based on a selective reading of a witness deposition and ignored testimony revealing that the defendant crime lab conducted technical reviews in cases involving DNA findings).

Because this is a bench trial, the need for the Court to determine the reliability of Dr. Carman's testimony prior to hearing her testimony is lessened. *See In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *see also Metavante Corp.*, 619 F.3d at 760 (observing that "the court in a bench trial need not make reliability determinations before evidence is presented" because "the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting"). Accordingly, the Court, in its discretion, denies Plaintiff's motion without prejudice to Plaintiff raising the issue at trial when additional testimony and context is provided by Dr. Carman.[2]

---

[2] In making his argument that Dr. Carman ignored data, Plaintiff also references the declaratory relief he seeks alleging Provident Life has waived and is estopped from asserting a defense of mistake as

11

**III. Dr. Carman Did Not Ignore the Policy Definition of "Total Disability"**

Plaintiff also challenges Dr. Carman's testimony alleging that she ignored Policy definitions, and facts, that impact her conclusions. (R.145-1, at 13 (Dr. Carman's testimony is therefore not reliable because she ignores Policy definitions, and facts, that affect the conclusions she is attempting to put forward").)

Plaintiff challenges Dr. Carman's reliance on two particular events relating to medical work Plaintiff engaged in after filing his disability claim. First, Plaintiff challenges Dr. Carman's reliance on Plaintiff's deposition testimony that he saw patients in his own practice during 2003 and 2004. Second, Plaintiff challenges Dr. Carman's reliance on Plaintiff's statement in his application to restore his medical license in 2006 that he did not have a medical condition that would impair or limit his ability to practice medicine with reasonable skill and safety. (R.145-1, at 10.) Plaintiff claims that Dr. Carman "uses this assertion for the proposition that Plaintiff admits that he is not disabled." (*Id.*) Plaintiff misconstrues this aspect of Dr. Carman's opinion. Dr. Carman's expert report states that "the best indicator whether someone is able to perform their vocational duties is the actual performance of those duties." (R.157-1, at 12.) Dr. Carman then proceeds to list a variety of activities that Plaintiff performed as a "psychiatrist and geriatric psychiatrist", including his duties as a psychiatrist in 2003 and 2004 and his work at his brother's medical practice in 2005-2006. In addition, Dr. Carman references Plaintiff's statement in 2006 to the Ohio Medical Board for license restoration denying that he had a medical condition that impaired or limited his ability to practice medicine with reasonable

---

to its initial determination that Plaintiff was Totally Disabled. (R.145-1, at 7-8.) The Court found that genuine issues of fact existed regarding whether the information Provident Life received after April 2007 justified reevaluating Plaintiff's disability claim under the Residual Disability provisions. (*See* R.132, at 41.) Accordingly, these are factual matters to be determined by the trier of fact. *See Manpower, Inc.*, 732 F.3d at 806.

skill and safety. Dr. Carman additionally relies on her conclusion that at that time, Plaintiff's visual acuity was 20/70-80 or better and that this "indicates Dr. Chaudhry was in fact able to perform duties as a psychiatrist and geriatric psychiatrist." Plaintiff's challenges to Dr. Carman's factual bases for her opinion regarding his work as a psychiatrist or geriatric psychiatrist are about the weight of Dr. Carman's testimony, not challenges to her methodology or the reliability of her opinion. *See Lapsley*, 689 F.3d at 805 (explaining that the accuracy of the actual evidence relied upon in a relevant and reliable expert opinion can be challenged with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence …'").

Plaintiff argues that because Dr. Carman ignored the policy definition of occupation and treated it with a broader stroke than warranted under the policy, her opinion is unreliable. (*See generally*, R.165.) Plaintiff, again, confuses the purpose of a *Daubert* challenge with the trier of fact's role. *See Stollings,* 725 F.3d at 765 (explaining that the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact"); *see also Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, ___ F.3d ___, 2015 WL 1434724 (7th Cir. 2015) (finding that after fulfilling its gatekeeping function, the district court "properly scrutinized each expert's assumptions, reasoning, and conclusions, as [its] duty as the trier of fact"). Dr. Carman's opinion does not ignore the policy definition of occupation, but provides different facts and conclusions for the basis of her opinion that Plaintiff's visual impairment was functionally mild and did not prevent him from performing the material and substantial duties of his vocation as a psychiatrist or geriatric psychiatrist during the time frame of the records review. A challenge to Dr. Carman's factual basis for her opinion—or questioning why she did not rely on other information she reviewed—goes to the weight, not the admissibility, of her opinion. Whether Dr.

13

Carmen's analysis aligns with the facts—as determined by the trier of fact—and the law is the focus of Plaintiff's reply brief. The merits of the factual and legal issues, however, are not an appropriate basis for exclusion of expert testimony under *Daubert* as they do not go to the reliability or relevance of the testimony. *See Manpower Inc.*, 732 F.3d at 806 ("The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed").

Plaintiff relies on a disability insurance policy disputed in *Rahman, M.D. v. Paul Revere Life Ins. Co.*, 684 F.Supp. 192 (N.D. Ill. 1988) to support its position that assertion of general definitions for occupations is trickery. (*See* R.165, at 6.) Plaintiff's reliance on *Rahman* is misplaced. In *Rahman*, the plaintiff—an emergency cardiologist—suffered a leg injury in a car accident that did not heal properly resulting in his inability to run. *Rahman*, 684 F.Supp. at 193. The court was looking at the evidence submitted by the parties during summary judgment to determine if genuine issues of fact existed surrounding the nature of plaintiff's pre-injury occupation as an emergency cardiologist. *Id.*, at 196. In particular, the court addressed the defendant insurance company's dispute as to whether an essential aspect of Dr. Rahman's pre-injury practice was to run to his patients. *Id.* at 194. The doctor in *Rahman*—without reviewing any of the plaintiff's personal information—opined that "the ability of a cardiologist to run to emergency cardiac patients is not a substantial and material function, duty, or responsibility of the practice of medicine in the field of … cardiology." *Id.*, at 196. The district court found that the expert's opinion did not create a genuine issue of material fact because it did not controvert the plaintiff's statement that an essential aspect of the plaintiff's pre-injury practice as an emergency cardiologist included his ability to run. *Id.* at 196-97. The procedural

posture of this case is inapposite to *Rahman*, as here Plaintiff is challenging the admissibility of Dr. Carman's opinion in a *Daubert* motion, not the ultimate determination of the factual issues in dispute and which arguments carry the day. For the same reasons, Plaintiff's reliance on *Stender v. Provident Life and Accident Ins. Co.*, No. 98 C 1056, 2000 WL 875919 (N.D. Ill. June 29, 2000), is also misplaced. In *Stender,* the plaintiff challenged defendant—Provident Life's—denial of disability benefits after having paid them for a period of time. *Stender*, 2000 WL 875919, at *2-3. The plaintiff filed for summary judgment, arguing that the only issue for the court to resolve was whether the plaintiff's post-disability occupation differed from his pre-disability occupation. *Id.*, at *3. Indeed, the district court in *Stender* recognized that in *Rahman* "the issue to be resolved was which of two occupations, a specialty or general field, was the insured performing at the time of his injury or disability." *Id.*, at *5. As noted above, a *Daubert* motion is not the appropriate stage to resolve factual issues in dispute. Plaintiff's arguments and reliance on *Rahman* and *Stender*—while they may have merit at trial—are inappropriate at this stage.

## CONCLUSION

For the reasons discussed in detail above, the Court denies without prejudice Plaintiff's motion to exclude the testimony of Defendant's expert, Dr. Carman.

**DATED:** **April 15, 2015**          ENTERED

_____
AMY J. ST. EVE
United States District Court Judge