# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NASEEM M. CHAUDHRY, M.D., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 12 C 5838 |
| PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Provident Life and Accident Insurance Company ("Provident Life") has moved the Court to exclude the testimony, opinions and report of Plaintiff's vocational expert, Susan Entenberg, at trial. For the reasons discussed below, Defendant's motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Naseem M. Chaudhry, M.D., is seeking disability benefits from an insurance policy issued by Defendant Provident Life ("Policy") based on the impact of a deteriorative eye condition. Plaintiff claims that this condition has rendered him unable to perform the substantial and material duties of his occupation. Defendant Provident Life paid total disability benefits to Plaintiff under the Policy from mid-2003 to August 2011. Provident Life subsequently concluded that insufficient evidence existed to support paying continued benefits to Plaintiff, including evidence that Plaintiff continued to treat patients and Plaintiff pled guilty to engaging in a scheme to defraud Medicare. Provident Life therefore terminated Plaintiff's disability

benefits on August 15, 2011. Plaintiff thereafter sued Provident Life for breach of contract, waiver, and estoppel. In advance of trial, Defendant now seeks to exclude the opinions of Plaintiff's retained vocational expert, Susan Entenberg, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999).

Under the Policy, Residual Disability benefits apply when, due to injury or sickness, the insured (1) is not able to do one or more of his "substantial and material daily business duties" or is not able to do his "usual daily business duties for as much time as it would normally take [him] to do it," (2) has a loss of monthly income in his occupation of at least 20%, and (3) is receiving care by a Physician which is appropriate for the condition causing the loss of monthly income. To qualify for Residual Disability benefits, the insured must suffer a loss of monthly income of at least 20% due to his disability. If the insured loses over 75% of his prior monthly income due to disability, the Policy deems the insured to have suffered a total loss of income. The Policy permits the insurer to require any proof it considers necessary to determine the insured's current and prior monthly incomes for purposes of calculating the Residual Disability benefit due, if any.

Under the Policy, the insured's "occupation" is "the occupation (or occupations, if more than one) in which [the insured is] regularly engaged at the time [he] become[s] disabled." If the insured's occupation "is limited to a recognized specialty within the scope of [his] degree or license," the Policy deems that specialty to be his occupation. Plaintiff has disclosed Ms. Entenberg to opine on his occupation at the time he became disabled, what his duties were at time, and whether he could be restored through reasonable accommodation. Ms. Entenberg is a Vocational Rehabilitation Counselor and a Certified Rehabilitation Counselor. (R. 149-1,

2

Entenberg Expert Report, at 4; R.149-2, Entenberg Dep., at 96-97.) Ms. Entenberg received her Bachelors of Science degree from Boston University in 1974 and her Masters in Counseling Psychology with an emphasis in rehabilitation counseling in 1975 from Northwestern University. (R.149-1, at 4.) Ms. Entenberg offers the following vocational opinion related to this case:

> Based upon my review of the above-stated records and my education, training, and experience, it is my opinion that Dr. Chaudhry's occupation at the time of his disability was that of a psychiatrist, with a primary emphasis as a geriatric psychiatrist. It is also my opinion that these duties included driving as well as the need to frequently read patient charts and medical records and are precluded by his visual limitations. It is further my opinion that his occupation as a psychiatrist could not be restored to a competitive nature through reasonable accommodation.

(R. 149-1, at 3.) On April 13, 2015, the Court held a *Daubert* hearing on the motion. During the hearing, Ms. Entenberg testified regarding her opinions.

## LEGAL STANDARD FOR *DAUBERT* MOTIONS

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact[,] . . . a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion. . . ." *Id.* "In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted "is not only relevant, but reliable." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013); *see also Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Lees v.*

*Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013) (explaining the current version of Rule 702 essentially codified *Daubert* and "remains the gold standard for evaluating the reliability of expert testimony"). The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *See Manpower, Inc.*, 732 F.3d at 806 (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

Under the expert-testimony framework, courts perform the gatekeeping function of determining prior to admission whether the expert testimony is both relevant and reliable. *See Manpower, Inc.,* 732 F.3d at 806; *Lees,* 714 F.3d at 521; *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: first, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees*, 714 F.3d at 521-22; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *Pansier*, 576 F.3d at 737. In *Daubert*, the Supreme Court offered the following non-exclusive factors to aid courts in determining whether a particular expert opinion is grounded in a reliable scientific methodology: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has a known or potential rate of error; and (4) whether the relevant scientific community has accepted the theory. *See Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010); *Winters v. Fru-Con Inc.*, 498 F.3d 734,

742 (7th Cir. 2007). Further, the 2000 Advisory Committee's Notes to Rule 702 list the following additional factors for gauging an expert's reliability: (1) whether the testimony relates to "matters growing naturally and directly out of research . . . conducted independent of the litigation"; (2) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (3) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (4) "[w]hether the expert is being as careful as he would be in his regular professional work outside paid litigation consulting"; and (5) "[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Id.* (internal quotations omitted); *see also American Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010); *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534-35 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006). "[B]ecause there are 'many different kinds of experts, and many different kinds of expertise,' the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors." *Lees*, 714 F.3d at 521, (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S. Ct. 1167 (1999)). *See also Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) (noting that the *Daubert* analysis is flexible); *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 608 n.4 (7th Cir. 2000) (noting that "the *Daubert* Court emphasized that it did not presume to set out a definitive checklist or test, and that the district judge's inquiry should be flexible") (quotations omitted).

In assessing the admissibility of an expert's testimony, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate.'" *Winters*, 498 F.3d at 742 (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would

5

be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire,* 526 U.S. at 152). A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (citing *Daubert,* 509 U.S. at 596). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id*.

> In addition, as this is a bench trial, the Seventh Circuit instructs:
>
> Where the gatekeeper and the factfinder are one and the same – that is, the judge – the need to make such decisions prior to hearing testimony is lessened. *See United States v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005). That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (observing that "the court in a bench trial need not make reliability determinations before evidence is presented" because "the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting"); *Brown*, 415 F.3d at 1269 ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself").

## ANALYSIS

Defendant contends that Ms. Entenberg's opinions lack reliability, are based on unsound methodology and amount essentially to advocacy and not science. Defendant does not, however, challenge Ms. Entenberg's qualifications.

**I.  Susan Entenberg's Opinions**

Ms. Entenberg is a Vocational Rehabilitation Counselor and a Certified Rehabilitation Counselor.  She describes her profession as:

> I'm a vocational rehabilitation counselor, so I work with individuals who have some form of impairment, be it physical, mental, a combination of both, to assess their vocational potential, and the goal is to return them to their maximum level of functioning, whatever that would be. To provide services to them.

(R. 149-2, Entenberg Dep., 96-97.)  Ms. Entenberg received her Bachelors of Science degree from Boston University in 1974 and her Masters in Counseling Psychology with an emphasis in rehabilitation counseling in 1975 from Northwestern University.  (R.149-1, Entenberg Expert Report, at 4.)  Ms. Entenberg has consulted as a vocational expert for the Social Security Administration since 1982 and has presented at various conferences over the last 30 years on Vocational Expert Testimony and Vocational Rehabilitation.  (*Id.*, at 5.)

Ms. Entenberg opined that Plaintiff's pre-disability occupation was as a psychiatrist, with a primary emphasis in geriatric psychiatry and further opined that his visual limitations prevent him from performing that occupation in a competitive nature through reasonable accommodation.  Specifically, she opined:

> Based upon my review of the above-stated records and my education, training, and experience, it is my opinion that Dr. Chaudhry's occupation at the time of his disability was that of a psychiatrist, with a primary emphasis as a geriatric psychiatrist.  It is also my opinion that these duties included driving as well as the need to frequently read patient charts and medical records and are precluded by his visual limitations.  It is further my opinion that his occupation as a psychiatrist could not be restored to a competitive nature through reasonable accommodation.

(*Id.*, at 3.)

In reaching her opinions, Ms. Entenberg reviewed various records, including an excerpt of the Policy definitions, Dr. Chaudhry's initial disability claim, correspondence between Dr. Chaudhry and Provident Life, Provident vocational rehabilitation reviews, reasons for denial of

7

insurance coverage, Dr. Chaudhry's 2002 income tax return, U.S. Department of Labor's Dictionary of Occupational Titles ("DOT"), as well as records relating to Dr. Chaudhry's indictment, change of plea hearing, the government's sentencing memo, sentencing hearing, and affidavits of Dr. Chaudhry and his brother—Mahmood Choudry. (*Id.*, at 1.) Although her standard method includes interviewing her subjects when she is given access to them, Ms. Entenberg did not interview Dr. Chaudhry because of his credibility and veracity issues stemming from his criminal guilty plea involving his medical billings. (Entenberg Daubert Hr'g. Tr., Apr. 13, 2015, 10:17-11:2; 77:10-78:17; R.149-2, 48:10-49:5.) Specifically, on April 14, 2010, Plaintiff pled guilty to one count of healthcare fraud in violation of 18 U.S.C. § 1347. *See* Minute Order After Change of Plea Hearing, United States v. Chaudhry, No. 06-cr-469 (N.D. Ill. Apr., 14, 2010) (R.60). Plaintiff pled guilty to knowingly and willfully executing a scheme to defraud. (*See id.*; Indictment, United States v. Chaudhry, No. 06-cr-469 (N.D. Ill. June 29, 2006) (R.1).) For these same reasons, although Ms. Entenberg reviewed Dr. Chaudhry's affidavit, she did not read his deposition. Instead, Ms. Entenberg thought it was important to primarily rely on the records in reaching her opinions. (Daubert Hr'g. Tr., 10:22-11:2.)

## II. Ms. Entenberg's Opinion that Dr. Chaudhry Had a "Primary Emphasis As a Geriatric Psychiatrist" Is Not Reliable

Ms. Entenberg opined that at the time he became disabled Dr. Chaudhry was "a psychiatrist, with a primary emphasis as a geriatric psychiatrist." (R.149-1, at 3.) Defendant argues that the Court should strike this portion of Ms. Entenberg's opinion because she did not have a reliable basis to make such an opinion. The Court agrees.

A court must ensure that expert testimony is relevant and reliable. *Manpower,* 732 F.3d at 806. "Reliability … is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology." *Id.*

Ms. Entenberg explained at the *Daubert* hearing that her opinion that Dr. Chaudhry had an "emphasis as a geriatric psychiatrist" means that "he was a psychiatrist and – but his emphasis was in providing services in nursing homes and with geriatric patients." (Daubert Hr'g. Tr., 5; *see also* R.149-2, 13:20-14:9.) In reaching this opinion, Ms. Entenberg relied on Dr. Chaudhry's initial claim for disability, his guilty plea transcript, the government's sentencing memorandum from his criminal case, Provident's vocational reviews, and his continuing medical education courses. (R. 149-1, at 2; R. 149-2, 17-18.) She then did a search on the Internet and found "a definition of the role what is a geriatric psychiatrist, who sees a geriatric psychiatrist" from the Geriatric Mental Health Foundation. (R. 149-2, 31-32.) Specifically, the Geriatric Mental Health Foundation provides:

> A geriatric psychiatrist is a medical doctor with special training in the diagnosis and treatment of mental disorders that may occur in older adults. These disorders include, but are not limited to, dementia, depression, anxiety, and late-life schizophrenia. Geriatric psychiatrist[s] see patients in many settings, including office, hospital, clinic, long-term care facility (nursing home), or an independent or assisted living facility.

(R. 149-1, at 2.) Although she was not familiar with the Geriatric Mental Health Foundation and does not personally regard it as an authoritative text, she relied on this definition as "information" to form her opinion. (R.149-2, 32-33.) Based on this definition—and the documentation and CME courses as discussed below—Ms. Entenberg opined that Dr. Chaudhry had a "primary emphasis as a Geriatric Psychiatrist."

Despite her opinion, Ms. Entenberg admitted that in Dr. Chaudhry's initial claim for disability he did not identify his occupation as a geriatric psychiatrist. (*Id.*, 33.) Instead, he identified himself as a "[p]sychiatrist seeing patients at hospitals, offices and nursing homes." (*Id.*) Furthermore, Ms. Entenberg admitted that on Dr. Chaudhry's Curriculum Vitae, he did not

9

list geriatric psychiatry as his specialty or emphasis, and that he did not have any board certifications in geriatric psychiatry. (*Id.*, 33-35, 138:24-140:4.)

Further, Dr. Chaudhry primarily worked at Rock Creek Center. Ms. Entenberg conceded that this facility was not a geriatric facility. (*Id.*, 43, 130.) In fact, she did not know how many geriatric patients were at this facility. (*Id.*) Moreover, when Dr. Chaudhry submitted his application to renew his license in Ohio, he stated that his specialty was psychiatry. (*Id.*, 139.) He did not mark the specialty of "geriatric psychiatry" on this application even though it was an available option. (*Id.*, 139-40). Ms. Entenberg did not review any of Dr. Chaudhry's patient records. As such, she did not know the age of the patients whom Dr. Chaudhry saw at the nursing homes, offices, or other hospitals he billed for visits to. (*Id.*, 131.) Even though Ms. Entenberg focused on Dr. Chaudhry's visits to nursing homes, she also acknowledged that nursing homes are not limited to treatment of geriatric patients. (Daubert Hr'g. Tr., 104:10-16 ("It's not exclusive. Majority are geriatric. But there's other disabled individuals. There's all types of people in nursing homes").)

Ms. Entenberg's additional reliance on Plaintiff's continuing medical education courses and billing practices in reaching her opinion does not rescue the reliability of her selective methodology and review of data. Ms. Entenberg relied on Plaintiff's continuing medical education courses, however, only five of Plaintiff's twenty-five CME courses were specific to geriatric patients. (R. 149-2, 135-36.) Ms. Entenberg further admitted that she did not know the ratio of continuing education courses he took related to geriatrics and non-geriatrics. (*Id.*, 35-37.) Ms. Entenberg's relied on Dr. Chaudhry's billings as reflective of his treatment of geriatric patients in nursing homes. She admitted, however, that she could not tell the percentage of the billings that pertained to nursing homes or what percentage were for geriatric patients.

10

(*Id.*, at 37:3-11.) Ms. Entenberg further admitted that because Dr. Chaudhry pled guilty to fraud in connection with his billings, including billing for services not performed, she could not trust the veracity of these billings. (Daubert Hr'g. Tr., 68:19-69:17.) She further admitted that she could not determine what billing treatments Dr. Chaudhry actually performed and what billings were fraudulent. (Daubert Hr'g. Tr., 78; *see also* R.149-2, 14:20-17:4, 19:15-22, 37:7-40:16.) Ms. Entenberg did not undertake an independent review of any of the patient charts to determine if Dr. Chaudhry made any notations in the charts to corroborate that he actually treated the patients. (R.149-2, 39:20-22.) Ms. Entenberg also conceded that Medicare reimbursements received by Dr. Chaudhry were not necessarily limited to the geriatric population. (*Id.*, 132.) Thus, she could not determine a patient's age simply based on a Medicare reimbursement. (*Id.*)

According to Ms. Entenberg's testimony at her *Daubert* hearing, she reached this opinion "based on the population, the nursing home population he was dealing with, [and because of the] amount of [his] continuing education primarily with geriatrics." (Daubert Hr'g. Tr., 85.) Ms. Entenberg, however, could not provide any details as to what a "primary emphasis" meant in terms of a percentage of Dr. Chaudhry's patient population being geriatric or a percentage of his time treating geriatric patients. (Daubert Hr'g. Tr., 85:13-25; 86:8-12.) In essence, she reached this conclusion because Dr. Chaudhry saw some patients in nursing homes even though he also saw patients at Rock Creek, his office, and regular hospitals. (R. 149-2, 131.) As Ms. Entenberg acknowledged, Dr. Chaudhry treated adolescents, adults and geriatrics. (*Id.*, 137.) Despite her opinion, Ms. Entenberg admitted that she did not review any patient records and did not know what percentage of his patients were geriatric, what percentage of his billings were for geriatric patients, or what percentage of his practice involved geriatric patients. (*Id.*).

Furthermore, Ms. Entenberg did not identify any particular education, experiences or training that she has had regarding geriatric psychiatrists to assist in reaching this opinion. Her underlying factual discrepancies are the result of faulty methods and a lack of investigation into Dr. Chaudhry's work. In sum, she has not identified a reliable basis or methodology for reaching her opinion that Dr. Chaudhry's occupation as a psychiatrist included "a primary emphasis as a geriatric psychiatrist," and the Court thus strikes it. *See Hartman v. EBSCO Industries, Inc.*, 758 F.3d 810, 818-19 (7th Cir. 2014) ("The hallmark of the Supreme Court's expert testimony cases is still reliability."). *See also Brown*, 765 F.3d at 773 (affirming district court's exclusion of expert testimony under *Daubert* where the expert's "factual deficiencies or discrepancies … [were] the result of [the expert's] faulty methods and lack of investigation").

III. **Ms. Entenberg's Opinion that Dr. Chaudhry's Visual Limitations Preclude Him from Restoring His Occupation as a Psychiatrist to a Competitive Nature Through Reasonable Accommodation is Admissible**

Defendant also seeks to preclude as unreliable Ms. Entenberg's opinion that Dr. Chaudhry's visual limitations precluded him from performing his occupational duties as a psychiatrist and that reasonable accommodation would not restore his occupation to a competitive nature. According to Defendant, Ms. Entenberg only reviewed the documentation provided by Plaintiff's counsel in rendering her opinions and failed to review relevant documentation and evidence in reaching her opinions.

In particular, Defendant argues that Ms. Entenberg's opinions are incomplete because she selectively picked information and because she "did not … ask for additional information, despite admitting that it could be helpful to her opinion." (R.149, Def's Mem. in Support to Exclude Evidence and Testimony of Entenberg, at 11.) Although, for example, Ms. Entenberg relied on Dr. Chaudhry's billing records as reliable, she ignored as unreliable Dr. Chaudhry's own notation in his application for medical license renewal to the Ohio Board … that he had no

12

condition which impaired or limited or restricted his ability to safely practice. (Daubert Hr'g. Tr., 51:25-52:10, 53:15-55:7.) Ms. Entenberg found this information irrelevant and unreliable because it was Dr. Chaudhry's own opinion about his medical restrictions and she relied only on medical information. (Daubert Hr'g. Tr., 55:3-10.) Ms. Entenberg did, however, rely on Dr. Chaudhry's testimony, along with that of his brother, Mahmood Choudry, when determining the type of work Dr. Chaudhry engaged in while working with his brother in Ohio, but only relied on the affidavits of Dr. Chaudhry and his brother and did not review their depositions even though she was aware of them and knew they were available. Based on her review, Ms. Entenberg testified that Dr. Chaudhry's work in Ohio was "completely different" than his previous work, even though he was still acting as a psychiatrist. (Daubert Hr'g. Tr., 39:18-20.)

Defendant argues that Ms. Entenberg failed to consider the actual evidence regarding Dr. Chaudhry's pre-disability occupation and capabilities. In particular, Defendant contends that Ms. Entenberg relied too heavily on the affidavit of Plaintiff's brother, Mahmood Choudry, without also reviewing his deposition which is allegedly contradictory. Ms. Entenberg's reliance on Mahmood's affidavit rather than his deposition is not a criticism of her methodology, but rather goes to the weight that should be afforded an opinion offered by Ms. Entenberg based on Mahmood's testimony. This argument is rooted in a credibility determination, which is inappropriate at the *Daubert* stage. *See Lapsley, Inc.,* 689 F.3d at 805 ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy"). Indeed, Ms. Entenberg testified that she did not review Dr. Chaudhry's brother's deposition—despite the fact that she did review his affidavit—even though she knew it was available. Ms. Entenberg relied on the affidavit and Mahmood's representation that he helped Dr. Chaudhry by organizing files, sorting documents, reading documents and

13

reading final copies of dictated documents. (Daubert Hr'g. Tr., 92:24-94:19) In his deposition, however, Mahmood Choudry testified that he was not assisting Dr. Chaudhry with any kind of reviewing charts, reading charts, seeing patients, making notes from his time practicing in Ohio and that he helped him on a few occasions no more than an hour per week. (R.149-4, Mahmood Choudry Dep., 24:5-13.) Ms. Entenberg testified that if Mahmood Choudry was actually only helping "on a few occasions" that would not be the same as what she understood his role to be in assisting Dr. Chaudhry. (Daubert Hr'g. Tr., 94:13-19.) Ms. Entenberg's reliance on Mahmood Choudry's affidavit without consideration of his deposition may prove to lessen the weight of her opinion. Defendant is free to conduct a rigorous cross examination of Ms. Entenberg and Mahmood Choudry to uncover alleged credibility issues as this is central to the importance of the adversary system. *See United States v. O'Neill*, 437 F.3d 654, 66 (7th Cir. 2006) (explaining the adversary system "which is fundamental to Anglo-American jurisprudence").

Defendant further argues that Ms. Entenberg's opinions regarding Dr. Chaudhry's vocation are incomplete and lack sufficient foundation because she "did not conduct an independent investigation." (R.149, at 11; *see also* R.162, Def's Reply Br., at 4-8.) Expert testimony, however, need not be based on first-hand knowledge or research actually conducted by the expert herself. *See Daubert*, 509 U.S. at 592; *Mihailovich v. Laatsch*, 359 F.3d 892, 919 (7th Cir. 2004) ("[T]he *Daubert* framework is a flexible one that must be adapted to the … type of testimony being proffered."); *Walker v. Soo Line R.R.*, 208 F.3d 581, 588 (7th Cir. 2000) ("[C]ourts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable"). Indeed, Ms. Entenberg testified that she did not need to review the medical records because the medical issues exceeded her experience. (R.149-2, 21-22; *see also* R.160, at 4.) To the extent Defendant criticizes her reliance on the same

information that Provident Life relied upon, that goes to the weight to be given to Ms. Entenberg's opinion, not its admissibility. *See Lapsley, Inc.,* 689 F.3d at 805; *see also* R.160, at 2 (explaining the Provident Life claims file contained information "deemed material to Plaintiff's claim").

Defendant also argues that Ms. Entenberg failed to review Dr. Chaudhry's visual limitations and capabilities and relied only on data provided by counsel in rendering her opinion. Specifically, Defendant contends that "Entenberg incorrectly assumed there was no question regarding Plaintiff's medical limitations" and did not "verify[] the accuracy and relevance of the data" provided by counsel. (R.149, at 10.) Defendant's criticisms of assumptions and accuracy of the data, however, are not a challenge to Ms. Entenberg's methodology in this case. Instead, Defendant's criticisms focus on the reliability of the underlying data and assumptions used by Ms. Entenberg in the application of her methodology. These criticisms go to the weight of the evidence and are better left to the adversarial process to be determined by the fact finder. *See Manpower, Inc.*, 732 F.3d at 808 ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis"); *Lapsley*, 689 F.3d at 805 (explaining that the accuracy of the actual evidence relied upon in a relevant and reliable expert opinion can be challenged with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence …'").

Similarly, Defendant argues that Ms. Entenberg's opinion is speculative, highlighting numerous "unfounded assumptions or admissions". (R.149, at 11-12; *see also* R.162, at 9-11.)[1]

---

[1] In arguing that Ms. Entenberg's opinion is speculative, Defendant also relies on *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809 (7th Cir. 2004). In *Ammons*, the Seventh Circuit affirmed the district court's holding that Ms. Entenberg's opinions regarding the ability of the plaintiff to return to work and perform the vast majority of his duties was unreliable. *Ammons*, 368 F.3d at 816. Defendant

15

The specific criticisms Defendant highlights, however, are reflective of Ms. Entenberg's understanding and assumptions in this case. Ms. Entenberg applied her own experience and relied upon various records, including the Provident Life claim file which included vocational assessments and vocational rehabilitation reviews addressing Dr. Chaudhry's visual limitations, as well as statements in affidavits from Dr. Chaudhry and his brother whom he worked for—in some capacity—after his initial disability claim. (R.149-1, at 1.) Ms. Entenberg further reviewed an excerpt of the Policy definitions, including the definition for "occupation", DOT occupational title of psychiatrist, Provident Life's reasons for denial of insurance coverage, as well as Dr. Chaudhry's 2002 income tax return, and records related to Chaudhry's fraud charges that included a review of his billing practices. (*Id.*) These records are included in the type of documents a vocational expert's methodology would normally rely on. *See Hale v. Gannon,* No. 1:11-cv-277-WTL-DKL, 2012 WL 3866864, at *4-5 (S.D. Ind. Sept. 5, 2012) (finding vocational expert's methodology to be scientifically reliable where expert derived functional limitations from medical records; applied light work limitations from the DOT; used the Bureau of Labor Statistics to determine wages; and utilized a scientific report regarding work-life expectancy and cited all of these sources in her report).

Defendant's argument that Ms. Entenberg's opinion is unreliable because she failed to conduct her own research into whether there were accommodations Plaintiff could utilize to perform his occupation fares no better. Defendant relies heavily on excerpts from Ms.

---

argues that here, like in *Ammons*, Ms. Entenberg did not interview Dr. Chaudhry, nor did she review his deposition, making her opinion unreliable. Ms. Entenberg provided an explanation as to why, in this case where credibility determinations are at the center of many disputes, she deviated from her standard procedure and refrained from interviewing Dr. Chaudhry and relied instead on the records available, including those in the claim file from Provident Life, in making her determinations. This explanation does not render Ms. Entenberg's methodology improper. What impact, if any, her decision to refrain from interviewing Dr. Chaudhry or review his deposition has on the accuracy and weight of her opinion is a matter properly left for trial. *See Lapsley,* 689 F.3d at 805.

16

Entenberg's deposition testimony in a previous, unrelated litigation, wherein she testified that a blind woman could work with accommodations. *See Estate of Breanna Davis v. Sparrow Hospital, et al.*, No. 121338 NH, Circuit Court for the County of Ingham, Michigan, Entenberg Deposition, Oct. 30, 2013 ("*Sparrow* deposition"). Defendant's reliance on the *Sparrow* deposition, however, only undermines its argument that Ms. Entenberg should have conducted independent investigation because it serves to show that her personal experience in the field as a vocational rehabilitation counselor has exposed her to information related to accommodations for the visually impaired. Indeed, as Defendant states in its brief, "Entenberg proffered a wealth of information regarding the accommodations available to visually impaired individuals" and "stated she frequently worked with visually impaired individuals to help them find work." (R.149, at 7; *see also* R.160, Pltf's Resp. Br., at 2 ("Entenberg, as a Vocational Rehabilitation Counselor, is qualified to use her training, education and experience to opine … whether Plaintiff could perform his occupation at a competitive level").) An expert's reliance on experience alone, does not render her opinion unreliable. *See* 2000 Advisory Committee Notes to Rule 702. "In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." *Id.* The Seventh Circuit has repeatedly stated that "genuine expertise may be based on experience or training." *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) (quoting *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir. 1996)). "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007) (citations and quotations omitted). As such, courts

"consider a proposed expert's full range of practical experience, as well as academic or technical training, when determining whether that expert is qualified to render an opinion in a given area." *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). Accordingly, Ms. Entenberg's former testimony regarding accommodations for the visually impaired serves to highlight her personal experience applicable to this case and does not render her opinion here, as to reasonable accommodation, inadmissible.

## CONCLUSION

For the reasons discussed in detail above, the Court grants in part and denies in part Defendant's motion to exclude the testimony of Plaintiff's expert, Ms. Entenberg.

**DATED:** May 1, 2015

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge